**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1138**

ADEBOWALE OLOYEDE OJO,

Petitioner,

v.

LORETTA E. LYNCH,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 8, 2015                Decided: February 16, 2016

Before MOTZ, KING, and KEENAN, Circuit Judges.

Petition for review granted; vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Keenan joined.

**ARGUED**: Henry Caleb Griffin, GRIFFIN AND GRIFFIN, Annapolis, Maryland, for Petitioner. Stefanie A. Svoren-Jay, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF**: Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, John S. Hogan, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

KING, Circuit Judge:

Adebowale Oloyede Ojo, a native of Nigeria and the adopted son of a United States citizen, petitions for review of the decision of the Board of Immigration Appeals (the "BIA") denying a motion to reopen his removal proceedings. In so ruling, the BIA relied on its administrative interpretation of a provision in the Immigration and Nationality Act (the "INA") relating to adopted children, codified at 8 U.S.C. § 1101(b)(1)(E)(i). That provision is not ambiguous in the way asserted by the BIA, however, and thus does not contain a gap that Congress has left for the BIA to fill. Moreover, the BIA's interpretation — which summarily disregards facially valid state court orders — is contrary to law. We therefore grant the petition for review, vacate the BIA's decision, and remand for further proceedings.

I.

A.

Before addressing the particulars of Ojo's case, we briefly sketch the relevant statutory framework governing citizenship for foreign-born children. Section 1431(a) of Title 8 provides that "[a] child born outside of the United States automatically becomes a citizen of the United States when [three] conditions" are satisfied:

2

- First, "[a]t least one parent of the child is a citizen of the United States, whether by birth or naturalization";

- Second, "[t]he child is under the age of eighteen years"; and

- Finally, "[t]he child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence."

An adopted child qualifies as a "child" for purposes of § 1431(a) if he was "adopted by a United States citizen parent" and satisfies the relevant requirements of 8 U.S.C. § 1101(b)(1). See § 1431(b).

Section 1101(b)(1)(E)(i), in turn, defines a child as "an unmarried person under twenty-one years of age," who was "adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years." The INA does not provide its own definition of the term "adopted," specify any requirements for a proper adoption, or contemplate the BIA's involvement in any adoption proceedings.

A foreign-born child who fails to obtain citizenship remains an alien. See 8 U.S.C. § 1101(a)(3). The Department of Homeland Security (the "DHS") — acting on behalf of the Attorney General — has the power to order certain aliens removed from the United States, including any alien who has committed an "aggravated felony." See 8 U.S.C. § 1227(a)(2)(A)(iii). For

3

purposes of § 1227(a)(2)(A)(iii), an "aggravated felony" is defined in § 1101(a)(43).

## B.

### 1.

The pertinent facts of this case are not in dispute. Ojo was born in Nigeria on August 28, 1983, and he lawfully entered the United States in August 1989. Two weeks later, on September 14, 1989, when Ojo was just six years old, his uncle — a United States citizen — became Ojo's legal guardian. More than ten years later, on June 19, 2000, when Ojo was sixteen, Ojo's uncle and the uncle's wife filed a petition to adopt Ojo. On January 24, 2001, after Ojo had turned seventeen, the Circuit Court for Montgomery County, Maryland (the "Maryland state court"), entered a judgment of adoption.

Between 2009 and 2012, Ojo was convicted of two drug-related offenses, either of which qualifies as an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(B). On May 6, 2013, in light of Ojo's convictions, and alleging that Ojo had not derived citizenship as an adopted child under 8 U.S.C. § 1431 and 8 U.S.C. § 1101(b)(1)(E), the DHS charged him with removability from the United States under 8 U.S.C. § 1227(a)(2)(A)(iii).

On May 15, 2014, an immigration judge (the "IJ") determined that Ojo was removable from this country by clear and convincing

4

evidence. The IJ explained that, because Ojo turned sixteen on August 28, 1999, and was not adopted by his citizen uncle until he was already seventeen years old, he did not qualify as an adopted child under § 1101(b)(1)(E). As a result, Ojo had not derived citizenship from his adoptive father (his biological uncle) pursuant to § 1431.

On June 25, 2014, the BIA received Ojo's notice of appeal of the IJ's decision. On September 10, 2014, in support of a request for a remand to the IJ, Ojo advised the BIA that his adoptive father would seek a nunc pro tunc order from the Maryland state court specifying that Ojo's adoption became effective before he turned sixteen.[1] Ojo asserted that the court would likely grant such an order because — between the time Ojo entered the United States at age six in 1989 and the approval of his adoption in 2001 — he had lived continuously as the child of his adoptive father.

On October 31, 2014, the BIA agreed with the IJ that Ojo was removable, recognizing that Ojo had the burden of proving his citizenship claim and showing that his adoption occurred before his sixteenth birthday. Relying on the judgment of

---

[1] The Latin phrase "nunc pro tunc" translates literally as "now for then." See John Gray, Lawyer's Latin 100 (2002). An order entered nunc pro tunc has "retroactive legal effect through a court's inherent power." See Black's Law Dictionary 1237 (10th ed. 2014).

adoption of January 24, 2001, the BIA ruled that Ojo was seventeen when adopted. Accordingly, the BIA decided that he did not qualify as an adopted child under § 1101(b)(1)(E) for purposes of derivative citizenship under § 1431. The BIA also concluded that Ojo's representation that his adoptive father would seek an order from the Maryland state court making Ojo's adoption effective nunc pro tunc to a date before he turned sixteen did not warrant a remand to the IJ. Consequently, the BIA dismissed Ojo's appeal.

On November 24, 2014, Ojo filed a timely motion to reopen his removal proceedings, supported by a nunc pro tunc order entered on October 29, 2014, by the Maryland state court. That order made Ojo's adoption effective on August 27, 1999, the day before he turned sixteen. By a decision of January 12, 2015, the BIA denied Ojo's motion to reopen, observing that it "does not recognize nunc pro tunc adoption decrees after a child reaches the age limit for both the filing of the adoption petition and decree." For that principle, the BIA relied on its prior decisions in Matter of Cariaga, 15 I. & N. Dec. 716 (BIA 1976), and Matter of Drigo, 18 I. & N. Dec. 223 (BIA 1982).

2.

In its Matter of Cariaga decision, the BIA had established a blanket rule that "[t]he act of adoption must occur before the child attains the age [specified in the INA]," thereby

6

precluding any consideration of a nunc pro tunc order entered after the relevant birthday but made effective before that date. See 15 I. & N. Dec. at 717. According to the BIA, "[t]hrough the imposition of an age restriction on the creation of the adoptive relationship, Congress has attempted to distinguish between bona fide adoptions, in which a child has been made a part of a family unit, and spurious adoptions, effected in order to circumvent statutory restrictions." Id. Thereafter, in Matter of Drigo, the BIA relied on its Cariaga decision and rejected the contention that "a decree of adoption is fully effective as of the date entered nunc pro tunc and is entitled to recognition for immigration purposes." See 18 I. & N. Dec. at 224. The BIA's Drigo decision emphasized that "[i]t was Congress' intent that the age restriction in [8 U.S.C. § 1101(b)(1)(E)(i)] be construed strictly." Id.[2]

In other words, on the premise that its decisions in Cariaga and Drigo would deter fraudulent and spurious adoptions, the BIA embraced an interpretation of § 1101(b)(1)(E)(i) that flouted the effective dates of adoptions set forth in facially

---

[2] The version of 8 U.S.C. § 1101(b)(1)(E)(i) applicable in Cariaga and Drigo required that the putative child be adopted before turning fourteen. In 1981, Congress amended that provision and changed age fourteen to age sixteen. See Immigration and Nationality Act of 1981, Pub L. No. 97–116, § 2(b), 95 Stat. 1611, 1611 (codified as amended at 8 U.S.C. § 1101(b)(1)(E)(i)).

valid nunc pro tunc orders entered by the various state courts of this country. Multiple federal courts thereafter cast substantial doubt on the BIA's Cariaga/Drigo rule. See, e.g., Cantwell v. Holder, 995 F. Supp. 2d 316 (S.D.N.Y. 2014); Hong v. Napolitano, 772 F. Supp. 2d 1270 (D. Haw. 2011); Gonzalez-Martinez v. DHS, 677 F. Supp. 2d 1233 (D. Utah 2009).

Only one of our sister courts of appeals has heretofore addressed the viability of the Cariaga/Drigo rule in a published opinion. In Amponsah v. Holder, the Ninth Circuit concluded "that the BIA's blanket rule against recognizing nunc pro tunc adoption decrees constitutes an impermissible construction of § 1101(b)(1) and that case-by-case consideration of nunc pro tunc adoption decrees is required." See 709 F.3d 1318, 1326 (9th Cir. 2013). The Ninth Circuit withdrew its Amponsah opinion a few months later, in September 2013, after the BIA advised the court that it was considering whether to overrule or modify the Cariaga/Drigo rule. See Amponsah v. Holder, 736 F.3d 1172 (9th Cir. 2013).

3.

In support of his motion to reopen his removal proceedings, Ojo invoked several of the federal court decisions discrediting the Cariaga/Drigo rule. The BIA, however, rejected those decisions across-the-board as "not binding." Specifically addressing the Ninth Circuit's Amponsah opinion, the BIA

8

observed that Ojo's "reliance on [Amponsah] is misplaced as this decision was withdrawn." The BIA did not acknowledge that the Ninth Circuit withdrew its Amponsah opinion because of the BIA's assurance to that court in 2013 that it was revisiting the Cariaga/Drigo rule — the very rule on which the BIA then relied in January 2015 to refuse to reopen Ojo's removal proceedings.

On February 10, 2015, Ojo filed a timely petition for review of the BIA's decision denying his motion to reopen. We possess jurisdiction pursuant to 8 U.S.C. § 1252.

4.

On July 8, 2015, during the pendency of this proceeding, the BIA modified the Cariaga/Drigo rule in its precedential decision in Matter of Huang, 26 I. & N. Dec. 627 (BIA 2015). The Huang decision related that Congress imposed an age restriction in 8 U.S.C. § 1101(b)(1)(E)(i) because it was concerned about "fraudulent adoptions that have no factual basis for the underlying relationship," as well as adoptions that, "despite having the appearance of validity, are actually motivated by a desire to circumvent the immigration laws." See id. at 629-30. Huang also explained, however, that "the blanket rule [from Cariaga and Drigo] we have applied for many years is too limiting in that it does not allow us to adequately consider the interests of family unity." Id. at 631.

9

Pursuant to the new Huang rule, the BIA will recognize a nunc pro tunc order relating to an adoption "where the adoption petition was filed before the beneficiary's 16th birthday, the State in which the adoption was entered expressly permits an adoption decree to be dated retroactively, and the State court entered such a decree consistent with that authority." See 26 I. & N. Dec. at 631. On July 22, 2015, pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, the Attorney General notified our Court of the Huang decision and asserted that, "under the new framework set forth in [Huang], Petitioner [Ojo] still did not derive citizenship under 8 U.S.C. § 1431."[3]

## II.

We review the BIA's denial of a motion to reopen removal proceedings for abuse of discretion. See Lin v. Holder, 771 F.3d 177, 182 (4th Cir. 2014). For our Court to grant a petition for review, the BIA's decision must be "arbitrary,

---

[3] At oral argument, the Attorney General's counsel maintained that her client would be entitled to press an additional contention if this matter were remanded: that Ojo cannot qualify for citizenship under 8 U.S.C. § 1431(a) because he did not become a legal permanent resident (an "LPR") prior to turning eighteen. The LPR issue was an alternative ground for the IJ's ruling that Ojo is a non-citizen removable from this country. The BIA did not reach the LPR issue, so it is not ripe for our review in this proceeding. See Mulyani v. Holder, 771 F.3d 190, 196 (4th Cir. 2014) ("[R]eview of an IJ decision is permissible only to the extent that the BIA adopted it.").

capricious, or contrary to law."  See Nken v. Holder, 585 F.3d 818, 821 (4th Cir. 2009).

## III.

The dispute presented here between Ojo and the Attorney General centers on the statutory phrase, "adopted while under the age of sixteen years."  See 8 U.S.C. § 1101(b)(1)(E)(i). More specifically, we must determine whether the term "adopted" plainly denotes the effective date of an adoption, or whether that term is ambiguous and could instead signify the date that the act of adoption occurred.  Only if the term "adopted" is ambiguous may we accord Chevron deference to the BIA's policy of summarily disregarding nunc pro tunc orders relating to adoptions conducted in the various state courts of this country — a policy engendered in the Cariaga/Drigo rule and recently modified in Huang.  See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

### A.

Congress has charged the Attorney General, and in turn the BIA, with administering significant portions of the INA.  See Fernandez v. Keisler, 502 F.3d 337, 343-44 (4th Cir. 2007). Thus, we generally evaluate the BIA's interpretations of the INA's provisions by following the two-step approach announced by the Supreme Court in Chevron.  See Barahona v. Holder, 691 F.3d

11

349, 354 (4th Cir. 2012). At Chevron's first step, we "examine the statute's plain language; if Congress has spoken clearly on the precise question at issue, the statutory language controls." Barahona, 691 F.3d at 354 (internal quotation marks omitted). If Congress has not so spoken, in that "the statute is silent or ambiguous, we defer to the agency's interpretation if it is reasonable." Id. (internal quotation marks omitted).

To resolve the initial inquiry under Chevron's first step, we focus "purely on statutory construction without according any weight to the agency's position." See Mylan Pharm., Inc. v. FDA, 454 F.3d 270, 274 (4th Cir. 2006). That is so "because '[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress.'" Id. at 274 (quoting Bd. of Governors, FRS v. Dimension Fin. Corp., 474 U.S. 361, 368 (1986)).

Preparing to handle the tools of statutory construction prompts us to emphasize, as we have frequently, that "the plain language of the statute is . . . the most reliable indicator of Congressional intent." See, e.g., Soliman v. Gonzales, 419 F.3d 276, 281–82 (4th Cir. 2005). If Congress's intent is clear from the plain text, "then, this first canon is also the last: judicial inquiry is complete." See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 462 (2002) (internal quotation marks omitted). As the Supreme Court has recently reiterated, however, "the meaning

12

— or ambiguity — of certain words or phrases may only become evident when placed in context." See King v. Burwell, 135 S. Ct. 2480, 2489 (2015) (internal quotation marks omitted). We therefore must "read the words in their context and with a view to their place in the overall statutory scheme." Id. (internal quotation marks omitted).

B.

1.

We begin with the text of the relevant statute. To be considered a "child" for purposes of derivative citizenship under 8 U.S.C. § 1431, an adopted child must, in pertinent part, be "adopted while under the age of sixteen years." See 8 U.S.C. § 1101(b)(1)(E)(i). A child is "adopted," of course, through an "adoption."

An adoption is "[t]he creation by judicial order of a parent-child relationship between two parties." See Black's Law Dictionary 58 (10th ed. 2014); see also Black's Law Dictionary 49 (6th ed. 1990) (defining "adoption" as the "[l]egal process pursuant to state statute in which a child's legal rights and duties toward his natural parents are terminated and similar rights and duties toward his adoptive parents are substituted"); Black's Law Dictionary 63 (3d ed., rev. 1944) (similar). The formal legal act of adoption "creates a parent-child relationship between the adopted child and the adoptive parents

13

with all the rights, privileges, and responsibilities that attach to that relationship."  See Black's Law Dictionary 58 (10th ed. 2014).

In short, an "adoption," as defined and commonly used, contemplates a formal judicial act.  Furthermore, it is well understood that, in the United States, our various state courts exercise full authority over the judicial act of adoption.  See Adoptive Couple v. Baby Girl, 133 S. Ct. 2552, 2565 (2013) (Thomas, J., concurring) (observing that "[a]doption proceedings are adjudicated in state family courts across the country every day, and domestic relations is an area that has long been regarded as a virtually exclusive province of the States" (internal quotation marks omitted)).

With those principles in mind, we discern no indication from the text of § 1101(b)(1)(E)(i) — or from any other aspect of the statutory scheme created in the INA — that Congress intended to alter or displace the plain meaning of "adopted." The term "adopted" thus carries with it the understanding that adoption proceedings in this country are conducted by various state courts pursuant to state law.  Plainly, therefore, a child is "adopted" for purposes of § 1101(b)(1)(E)(i) on the date that a state court rules the adoption effective, without regard to the date on which the act of adoption occurred.

2.

Viewing 8 U.S.C. § 1101(b)(1)(E)(i) in the broader context within which Congress legislates confirms our plain reading of the statute. Although the Constitution commits to the federal legislature the power "[t]o establish an uniform Rule of Naturalization," see Const. art. I, § 8, cl. 4; Johnson v. Whitehead, 647 F.3d 120, 130 (4th Cir. 2011), it has long been a hallmark of our federalism principles that full authority over domestic-relations matters resides not in the national government, but in the several States. See Ex parte Burrus, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.").

To that end, "the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations." See United States v. Windsor, 133 S. Ct. 2675, 2691 (2013) (relying on De Sylva v. Ballentine, 351 U.S. 570, 580 (1956), wherein the Supreme Court itself observed that, "[t]o determine whether a child has been legally adopted, for example, requires a reference to state law"); see also Full Faith and Credit Act, 28 U.S.C. § 1738 (codifying federal policy of deference to state court orders). It is not surprising, then, that the federal courts might look suspiciously upon a federal agency that treads on a traditional judicial domain of

15

the various States.  See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 172-73 (2001) (explaining that the courts expect a "clear indication" of congressional intent when an "administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power").

Here, if Congress had intended a modified definition of the term "adopted" for purposes of federal immigration law and sought to place the interpretation thereof in the hands of an administrative agency, such as the BIA, Congress would have made that intention "unmistakably clear."  See Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) (internal quotation marks omitted) (acknowledging that "the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere").  Congress did not, for example, specify requirements in the INA that, if met, would confer upon a child the status of "adopted" for purposes of federal immigration law.  Nor did Congress explicitly circumscribe state authority over adoptions in the immigration context, as it has elsewhere.  See Adoptive Couple, 133 S. Ct. at 2557 (majority opinion) (observing that the Indian Child Welfare Act of 1978 "establishes federal standards that govern state-court child custody proceedings involving Indian children").  Nor did Congress expressly confer on the Attorney

16

General or the BIA any power to override the States' traditional control over adoptions. See 8 U.S.C. § 1103(g) (outlining powers and duties of Attorney General under INA).

Instead, in 8 U.S.C. § 1101(b)(1)(E)(i), Congress chose the simple phrase, "adopted while under the age of sixteen years." The inclusion of an age requirement in the statute — without more — cannot be read to create some power of federal agency review over state court adoption orders. Thus, when an individual has been "adopted" under § 1101(b)(1)(E)(i) depends on the effective date of the adoption as set forth in the relevant state court instruments. Cf. Carachuri-Rosendo v. Holder, 560 U.S. 563, 576-78 (2010) (explaining that federal immigration court must look to state conviction itself to determine whether state offense is "aggravated felony" under INA).

Put succinctly, the plain meaning of "adopted" in § 1101(b)(1)(E)(i) forecloses the BIA's summary disregard of facially valid nunc pro tunc orders relating to adoptions conducted by the various state courts. Although the BIA — in its recent Huang decision — has jettisoned the Cariaga/Drigo rule's absolute prohibition on giving any effect to such orders in immigration matters, the BIA nonetheless has continued to automatically deny recognition to some. The term "adopted" is not ambiguous under Chevron's first step, and the BIA's

17

interpretations that circumscribe reliance on nunc pro tunc orders are not entitled to deference.

In these circumstances, it was contrary to law for the BIA not to recognize the nunc pro tunc order in Ojo's case. As a result, the BIA abused its discretion in denying Ojo's motion to reopen his removal proceedings.[4]

IV.

Pursuant to the foregoing, we grant Ojo's petition for review and vacate the BIA's decision denying Ojo's motion to reopen his removal proceedings. We remand to the BIA for such other and further proceedings as may be appropriate.

<u>PETITION FOR REVIEW GRANTED;</u>
<u>VACATED AND REMANDED</u>

---

[4] We need not reach any issue of whether the Attorney General or the DHS is entitled to demonstrate that a particular state court nunc pro tunc order evinces a fraudulent or spurious adoption. Importantly, the Attorney General conceded at oral argument that there are no indications of fraud with respect to the 2014 nunc pro tunc order relating to Ojo's adoption in the Maryland state court.