KING, Circuit Judge, dissenting:
*858 I write separately to explain my view that the immigration authorities and my good colleagues in the panel majority have erred in their rulings on the SIJ application of Felipe Perez. Their fatal error primarily relates to the failure to adhere to North Carolina state law concerning child custody orders, particularly as to the custody of Felipe. As explained further below, I would reverse the immigration rulings and remand.
The USCIS has erroneously decided that an applicant for SIJ status must produce a "permanent" custody order. The Agency predicates this requirement on a faulty reading of the INA, which governs SIJ eligibility. Felipe challenges that interpretation, which led the Agency to wrongfully deny his SIJ application. My friends in the panel majority, however, have not resolved this straightforward question of statutory construction and have thereby committed two errors. First, the majority mistakenly applies a deferential standard of review to the Agency's flawed interpretation. Second, by avoiding that interpretive issue, the majority tacitly accepts the Agency's requirement that a custody order supporting an SIJ application must be "permanent." That requirement, however, finds no support in the INA. Absent a clear directive from Congress, long-standing principles of federalism compel our deference to state law in the sensitive area of domestic relations, which encompasses such custody determinations. Because the North Carolina district court issued a valid custody order regarding Perez, both the Agency and this Court are obliged to respect it. The Agency erred in denying Perez's SIJ application, and I therefore dissent.
I.
To start, it is necessary to clarify the standard of review that governs Felipe's appeal. The majority opinion correctly explains that a challenge to an agency decision-specifically, the denial of Felipe's SIJ application by the USCIS-is subject to review under the APA. That is, we should only set aside that denial if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A). The latter aspect of that APA provision-"otherwise not in accordance with law"-is particularly relevant here. As the Supreme Court explained long ago, "an order may not stand if the agency has misconceived the law." See SEC v. Chenery , 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Thus, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." See PPG Indus., Inc. v. United States , 52 F.3d 363, 365 (D.C. Cir.1995) (citing South Prairie Constr. Co. v. Int'l Union of Operating Eng'rs , 425 U.S. 800, 806, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) ; Chenery , 318 U.S. at 94-95, 63 S.Ct. 454 ).
Put simply, the decisions of the Agency and its AAO that Felipe challenges readily show such a legal error. The Agency and the AAO did not merely "evaluate whether the particular [custody] order presented by Perez" satisfied the SIJ provision. See ante at 853. That is, the proper focus of our review is not whether the Agency correctly assessed the particular facts of Felipe's SIJ application. Rather, the Agency's denial of his SIJ application makes clear that the Agency has adopted a specific interpretation of the SIJ statutory provision, and that it denied his application for SIJ status on the basis of that interpretation. More specifically, the Agency reads the statutory requirement that an SIJ applicant *859 be "under the custody of" an agency or individual in the United States to require a permanent custody order. See J.A. 27.[1] And the Agency and AAO denied Felipe's application because the North Carolina custody order he submitted with his application apparently lacked such permanence. See id . at 22-23, 26-27. The question presented, therefore, is one of statutory interpretation.
This crucial point bears further explanation, since it marks where I diverge from my colleagues. The panel majority opines that the Agency and AAO did not impose "a categorical permanency requirement" on a child's custody order required for SIJ eligibility. See ante at 853. It is this mistaken view of the immigration rulings that leads the majority to erroneously apply the deferential arbitrary and capricious standard. See id . at 852, 852-53.
The decisions of the Agency and AAO as to Felipe Perez belie that conclusion. In their rulings, the immigration authorities fault the temporary nature of Felipe's custody order and explicitly deny his application on that basis. See J.A. 27 (As the Agency emphasized in this case, "the [North Carolina] court order submitted is expressly temporary in nature and does not make a finding that reunification with one or both parents is permanently not viable."); id . at 22 (The AAO further explained: "Accordingly, the [North Carolina] ex parte emergency order was not a qualifying juvenile court order ... because there was no finality to the proceedings."). Notably, the Government's brief on appeal seeks to sustain the Agency's denial of Felipe's application on that specific ground. See, e.g. , Br. of Appellee 20, 24. Although "the AAO does not use the word permanent" in its rejection of Perez's custody order, that point is irrelevant when the Agency has repeatedly faulted the custody order as "temporary" and lacking "finality"-that is, for not being permanent. See ante at 853; J.A. 22-23, 26-27.[2]
In sum, the Agency rulings make clear-beyond peradventure-that the Agency interprets the SIJ provision to require a permanent custody order. Moreover, the Agency has openly adopted that interpretation in their policy manual, as discussed below. See J.A. 186-87. Accordingly, our review today turns only on whether the Agency's interpretation of the term "custody," as used in the SIJ provision, is correct as a matter of law.
Recognizing that Felipe's appeal challenges the Agency's interpretation of a federal statute, the question becomes whether we owe any deference to that interpretation. Notably, the record offers no evidence that the Agency arrived at its understanding of the SIJ provision through formal rule-making or some other process that would endow its view with the force of law. As a result, the significant deference afforded to decisions that result from such processes under the Chevron doctrine does not apply here. See United States v. Mead Corp. , 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (explaining scope of deference under doctrine announced in *860 Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc. , 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ); see also Ramirez v. Sessions , 887 F.3d 693, 701 (4th Cir.2018) (same). Nor does the Agency's position merit deference under the Supreme Court's decision in Auer v. Robbins , which applies only to an agency's interpretation of its regulations. See 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Again, the Agency has not promulgated any regulations regarding the meaning of the term "custody," as used in the SIJ provision.
Instead, the Agency has presented its interpretation of the SIJ provision in what it calls a "policy manual." See J.A. 186-87; see also U.S. Customs & Imm. Serv., USCIS Policy Manual, Vol. 6: Immigrants (the "Policy Manual"). Specifically, the Agency's explanation of the SIJ provision in the Policy Manual provides: "Court-ordered dependency or custodial placements that are intended to be temporary generally do not qualify for the purpose of establishing eligibility for SIJ classification." See Policy Manual, Ch. 2-Eligibility Requirements, § D.1.
Unfortunately for the USCIS, however, an agency's interpretation of a statute that is "contained in policy statements, agency manuals, and enforcement guidelines" does not receive deference under either the Chevron or Auer doctrines. See Christensen v. Harris County , 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ; see also Mead , 533 U.S. at 234-35, 121 S.Ct. 2164. A "policy manual" receives only the deference that is "proportional to its power to persuade," according to the so-called Skidmore doctrine. See Mead , 533 U.S. at 234-35, 121 S.Ct. 2164 (internal quotation marks omitted) (discussing and applying Skidmore v. Swift & Co. , 323 U.S. 134, 139-40, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ); see also Christensen , 529 U.S. at 587, 120 S.Ct. 1655. Thus, the immigration authorities' position is entitled to deference only to the extent we are persuaded by "the degree of the agency's care, its consistency, formality, and relative expertness," and the overall "persuasiveness of the agency's position." Mead , 533 U.S. at 228, 121 S.Ct. 2164 (citing Skidmore , 323 U.S. at 139-40, 65 S.Ct. 161 ).[3]
In these circumstances, this appeal cannot be resolved by merely reviewing the Agency's final conclusion under the arbitrary and capricious standard of the APA. Rather, this appeal turns solely on a question of law, and legal issues are reserved to the courts. It therefore falls upon us to assess and decide whether the Agency's interpretation of the term "custody," as used in the SIJ provision, is "otherwise not in accordance with law." With that guiding principle in mind, I will explain why the interpretation of "custody" employed by the Agency and the AAO-that is, limiting the term to permanent custody orders only-cannot be sustained.
II.
As my distinguished colleagues have ably explained, the INA permits an immigrant juvenile who is present in the United States to seek SIJ status in order to thereafter pursue lawful permanent resident status. See ante at 850. To obtain SIJ status, the SIJ applicant must, pursuant to the INA, have either been declared dependent on a juvenile court "or placed under the custody of" an agency or individual in the United States. See *861 8 U.S.C. § 1101(a)(27)(J). Felipe's appeal centers on the meaning of the phrase "under the custody of," which the Agency has inappropriately rewritten and amended to require a "permanent" custody order. See J.A. 27; see also Policy Manual, Ch. 2-Eligibility Requirements, § D.1 (explaining that temporary custody orders "generally do not qualify for the purpose of establishing eligibility for SIJ classification").[4] We are therefore called upon to assess the Agency's interpretation of a statutory term that implicates "traditional state-law questions." See, e.g. , Thompson v. Thompson , 484 U.S. 174, 186, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (explaining state-law nature of custody determinations).
We recently addressed a similar intersection of federal immigration law with domestic relations law in Ojo v. Lynch , 813 F.3d 533 (4th Cir.2016). As we explained in Ojo , if a federal statute incorporates a term that derives from and is controlled by state law principles, those principles-and basic tenets of federalism-inform the plain meaning of the incorporated term. See id . at 539-41. According proper weight to federalism principles, I will first evaluate whether the Agency's interpretation of the term "custody" merits deference pursuant to the Skidmore doctrine. I will then assess whether the term "custody," as used in the SIJ provision of the INA, renders legally insufficient the custody order that Felipe submitted with his SIJ application.
A.
To start, the markers of "persuasiveness" under the Skidmore doctrine do not apply to the agency interpretation at issue here. As explained above, a court considering the extent of deference owed to an agency interpretation under Skidmore should consider the "degree of the agency's care, its consistency, formality, and relative expertness," and the overall "persuasiveness of the agency's position." Mead , 533 U.S. at 228, 121 S.Ct. 2164 ; see also Sierra Club v. U.S. Dep't of the Interior , 899 F.3d 260, 288 (4th Cir.2018) (same). None of those factors urge deference to the Agency's reading of the term "custody."
Put succinctly, the Policy Manual does not evince that it was prepared with a high degree of care, most clearly because its conclusion that "custody" requires "permanence" relies on regulations and unrelated statutory provisions that support no such understanding. See Policy Manual, Ch. 2-Eligibility Requirements, nn. 6-9. For example, in support of its interpretation of "custody" in the SIJ provision, the Manual relies on a statutory provision that discusses in loco parentis relationships-which are entirely distinct from custody determinations. See id . at n.8.[5]
*862 The consistency of the Agency's position is not clear from the present record, although in 2011 it proposed a rule to expressly approve temporary custody orders for SIJ purposes, which was not adopted. See 76 Fed. Reg. at 54980. The formality of the Policy Manual appears to be minimal, in that its preparation was not subject to any formal administrative processes. Most importantly, the state law of domestic relations in North Carolina is far beyond the expertise of the Agency. See, e.g. , Thompson , 484 U.S. at 186, 108 S.Ct. 513 (emphasizing that child custody determinations are "traditional state-law questions"); see also Mead , 533 U.S. at 234-35, 121 S.Ct. 2164 (explaining that Skidmore deference arises from and relates to some "specialized experience" of relevant agency). Finally, as explained below, the position of the Agency fails to persuade in light of the principles of federalism that inform any interpretation of domestic relations law-including "custody"-that arises in federal statutes.
In sum, the Agency's interpretation of the term "custody"-as used in the SIJ provision of the INA-does not merit any deference under Skidmore . Thus, my next step is to consider that interpretation de novo, applying ordinary principles of statutory construction. See Sierra Club v. U.S. Army Corps of Eng'rs , 909 F.3d 635, 645 (4th Cir.2018) (denying Skidmore deference and reviewing de novo agency's statutory interpretation).
B.
Our Ojo decision assessed an interpretation of the term "adopted," as used in the INA, that was employed by the Board of Immigration Appeals. See 813 F.3d at 535. As here, the question in Ojo turned on state domestic relations law, an area in which "the Federal Government, through our history, has deferred to state-law policy decisions." See id . at 540 (quoting United States v. Windsor , 570 U.S. 744, 767, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) ); see also Sosna v. Iowa , 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (explaining that domestic relations law is "a virtually exclusive province of the States"). There, as here, the INA had incorporated the state law term without modifying, defining, or otherwise limiting it. See Ojo , 813 F.3d at 535. Thus, Ojo provides the framework for the question presented here.
To discern the plain meaning of the term "custody," we look to the common understanding and ordinary definition of it. See Ojo , 813 F.3d at 539-40. In Ojo , we also considered the relevant broader context; specifically, we adhered to the federalism principles that have informed the federal government's treatment of domestic relations issues for more than a century. See id . ; see also King v. Burwell , --- U.S. ----, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) (emphasizing that meaning of statutory term "may only become evident when placed in context"); Ex parte Burrus , 136 U.S. 586, 593-94, 10 S.Ct. 850, 34 L.Ed. 500 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."). We also followed the Supreme Court's admonition that when an "administrative interpretation" permits "federal encroachment upon a traditional state power," a court must look for a "clear indication" of congressional intent to support that interpretation. See Ojo , 813 F.3d at 540 (quoting Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs , 531 U.S. 159, 172-73, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ).
Applying that approach to the interpretive issue presented in Felipe's appeal, I am satisfied that the term "custody," as *863 used in the INA's SIJ provision, retains its plain and ordinary meaning. That is, it simply refers to the "care, control, and maintenance of a child awarded by a court to a responsible adult." See Custody, Black's Law Dictionary (10th ed. 2014). It "involves legal custody (decision-making authority) and physical custody (caregiving authority), and an award of custody [usually] grants both rights." Id . That accepted definition of custody admits no temporal limits. Although a person may exercise custodial authority over a child for a period of days or years, the nature of the authority is unchanged.
Indeed-although not in the immigration context-Congress itself has defined a "custody determination" as a court order "providing for the custody of a child," including "permanent and temporary orders." See 28 U.S.C. § 1738A. That definition is contained in a statutory provision requiring each state to respect the custody determinations of other states. The Supreme Court subsequently ruled that the provision did not create a federal cause of action due to, inter alia, the long-established primacy of state law in custody determinations. See Thompson , 484 U.S. at 186-87, 108 S.Ct. 513. Although not controlling, that provision and the Supreme Court decision interpreting it provide context for the question we are called upon to resolve in these proceedings. Specifically, they emphasize the lack of temporal limits attached to the common understanding of the term "custody," as well as the continued deference we owe to state law and state courts in custody matters.
That context supports the general rule that the plain meaning of a domestic relations term like "custody"-or the term "adopted" at issue in Ojo -incorporates an understanding that state courts traditionally exercise full authority over that area of law. See Ojo , 813 F.3d at 539 (citing Adoptive Couple v. Baby Girl , 570 U.S. 637, 133 S.Ct. 2552, 2565, 186 L.Ed.2d 729 (2013) (Thomas, J., concurring) (emphasizing that "domestic relations is an area that has long been regarded as a virtually exclusive province of the States") (internal quotation marks omitted) ). Thus, absent any contrary indication from Congress, the ordinary meaning of the term "custody" carries the understanding that its specific content is to be determined with due deference to state court rulings. See id . at 540.
The SIJ custody provision lacks any indication that Congress "intended to alter or displace" the plain meaning of "custody." See Ojo , 813 F.3d at 540. Congress simply did not define "custody" for purposes of the INA, nor did it "circumscribe state authority" over custody in the immigration context, or otherwise confer plenary power in the Agency to "override" traditional state control of child custody issues. See id . Absent strong evidence that Congress sought to limit or alter state powers over such matters, the term "custody" retains the understanding that custody determinations are generally conducted "by various state courts pursuant to state law." See id . ; see also Windsor , 570 U.S. at 767, 133 S.Ct. 2675 (observing that "there is no federal law of domestic relations") (quoting De Sylva v. Ballentine , 351 U.S. 570, 580, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) ). In such circumstances, a valid custody order from the relevant state court must be given full credit. See Ojo , 813 F.3d at 541. Accordingly, the Agency is not entitled to summarily reject such a state court custody order by imposing a permanency requirement lacking any basis in the applicable SIJ provision.
Nor does any other provision or principle of federal law support an amendment to or recasting of the SIJ provision to *864 create a permanency requirement. Notably, the very section of the INA containing the SIJ provision freely uses temporal limitations elsewhere. See, e.g. , 8 U.S.C. § 1101(a)(27)(H) (providing that immigrant seeking special status based on medical expertise must have been "permanently licensed" to practice). The omission of such limits from the SIJ provision is therefore highly significant, presumptively intentional, and binding on the Agency and the courts. See United States v. Serafini , 826 F.3d 146, 149 (4th Cir.2016) (explaining that the courts presume "that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of a term) (quoting Russello v. United States , 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ). And the history of the SIJ provision reflects a congressional intent to expand its scope to encompass a broader class of juveniles. See Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457, 122 Stat. 5044, 5079 (the "TVPRA") (removing requirement that SIJ applicant be eligible for "long-term foster care"). Finally, although the Policy Manual (and the district court) invoked § 235(d)(5) of the TVPRA to show that temporary custody orders do not satisfy the SIJ provision, that section applies only to 8 U.S.C. § 1232 -not to the SIJ provision-and it addresses in loco parentis relationships rather than custody determinations. See id ., 122 Stat. at 5080 (codified as amended at 8 U.S.C. § 1232(d)(5) ).
Turning to the specific custody order that Felipe submitted to support his SIJ application, such a valid custody order from the relevant state court was entitled to full credit from the Agency. See Ojo , 813 F.3d at 541. It is undisputed in this appeal that the District Court of Mecklenburg County, North Carolina-which entered Perez's custody order-appropriately exercised jurisdiction over Perez, who at that time was a minor residing in that state. See J.A. 127-28.[6] The state district court made the necessary findings under North Carolina law and then awarded "emergency temporary custody and control" of Felipe to his brother. See id . at 129; see also N.C. Gen. Stat. § 50-13.2 (describing requirements for custody award). As discussed above, nothing in federal law disqualifies such awards of temporary custody-duly rendered by the appropriate state court-from satisfying the SIJ provision. And, in awarding custody to Felipe's brother, the North Carolina district court made the only findings that the SIJ provision requires: that Felipe's reunification with his parents was "not viable" because they had "abandoned, neglected, and abused" him; and that it was not in "Perez's best interest to return to [his previous country of nationality,] Guatemala." See J.A. 128-29; see also 8 U.S.C. § 1101(a)(27)(J)(i)-(ii). Thus, Felipe's custody order was valid under North Carolina law and satisfies the plain meaning of the actual requirements of the SIJ provision.
In sum, the term "custody," as used in the SIJ provision, retains its plain meaning, which does not have a temporal limit and accords due deference to the pertinent state court decisions. See Ojo , 813 F.3d at 540-41. Congress has in no way demonstrated its intention to limit the force of such decisions in the immigration context. Absent such an intention, the Agency was obliged to recognize the state court custody order submitted by Felipe in support of his SIJ application, and I would-due to this legal error-reverse the Agency's denial of his application.
C.
The foregoing analysis demonstrates that federal law does not limit the plain *865 meaning of the term "custody," which can encompass both temporary and permanent relationships. It also shows that, absent a clear indication that Congress sought to limit that meaning, the federal courts and the federal agencies must respect a state court's determination of such matters. Those settled propositions should end our analysis of Felipe's SIJ application.[7]
Given, however, that both the Agency and the panel majority delve into North Carolina law, it is also necessary to briefly clarify their misapprehensions thereof. I simply observe that North Carolina law-like the INA-does not reflect that temporary custody fails to qualify as "custody." Temporary custody is precisely what it purports to be: an award of custody for a limited period of time. See, e.g. , Regan v. Smith , 131 N.C.App. 851, 509 S.E.2d 452, 454-55 (N.C. Ct. App. 1998) (explaining that temporary custody order has set expiration whereas permanent custody order is intended to last indefinitely). Put succinctly, the meaning of custody under North Carolina law does not exclude temporary orders from the definition of that term. See, e.g. , Peters v. Pennington , 210 N.C.App. 1, 707 S.E.2d 724, 736 (2011) (defining custody as "the right and responsibility to make decisions with important and long-term implications for a child's best interest and welfare"); see also N.C. Gen. Stat. § 50A-102(3) (defining a "child-custody determination" as a court order "providing for the legal custody, physical custody or visitation with respect to a child" and explaining that "[t]he term includes a permanent, temporary, initial, and modification order").
As to the custody order secured for Felipe from the Mecklenburg County district court, it is true, as the majority observes, that the order was entered under the district court's temporary emergency powers pursuant to N.C. Gen. Stat. § 50A-204. See J.A. 127. That provision's grant of jurisdiction, however, is not an empty one-it confers on the state court the power to make a child-custody determination. See N.C. Gen. Stat. § 50A-204(b) - (d). And the North Carolina court made such a determination. See J.A. 129 (order granting "emergency temporary custody and control" of Felipe to his brother). Again, there is absolutely nothing in North Carolina law that suggests that such a temporary award of custody does not, in fact, confer custody. In these circumstances, the Agency's unwarranted rejection of Perez's custody order for lacking "permanence" is particularly troubling. The Agency's flawed reading of the SIJ provision yields the untenable result that a federal agency has decided that an entire category of state court custody orders-any order issued in North Carolina pursuant to that state's emergency custody statute-has no effect for purposes of the SIJ provision.[8]
North Carolina distinguishes between temporary and permanent custody orders for other purposes. For example, the temporal scope of a custody order has implications *866 for a court's ability to modify that order. See Woodring v. Woodring , 227 N.C.App. 638, 745 S.E.2d 13, 17-18 (2013). Moreover, as the majority argues, emergency temporary orders-like the one issued as to Felipe-cannot terminate the parental rights of the child's parents. See In re N.T.U. , 234 N.C.App. 722, 760 S.E.2d 49, 52-53 (2014). But that rule does not preclude an award of custody to some other person while the parents' rights are finally adjudicated. See Kanellos v. Kanellos, ---- N.C.App, ----, 795 S.E.2d 225, 229 (N.C. Ct. App. 2016) (explaining that a temporary custody order establishes "a party's right to custody of a child pending the resolution of a claim for permanent custody"). Thus, it is clear that, although there may be limits to the consequences of a temporary custody order, nothing in North Carolina law demonstrates that such an order does not, in fact, confer custody.
Because I would reverse and remand, I respectfully dissent.

Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

The Agency explained its rejection of Felipe's SIJ application by referring to his custody order as "expressly temporary" three separate times. See J.A. 26-27. And it concluded on that basis that Felipe had not demonstrated his eligibility for SIJ status. See id . at 27 ("In this case, the court order submitted is expressly temporary in nature ..."). The AAO ruling mirrored that analysis. See id . at 22-23 (concluding that custody order failed to satisfy SIJ provision because it was merely "temporary protective order[ ]").

To the extent that the Agency and AAO decisions underlying this appeal do not expressly rely on the Policy Manual, those decisions are simply informal adjudications that likewise do not warrant deference under either the Chevron or Auer doctrines. See Mead , 533 U.S. at 230-34, 121 S.Ct. 2164 ; see also Ramirez , 887 F.3d at 701. And, as explained above, they emphasize the same permanency requirement adopted in the Policy Manual.

The SIJ provision of the INA also requires an SIJ applicant to show that "reunification with 1 or both of the immigrant's parents is not viable." See 8 U.S.C. § 1101(a)(27)(J). The Agency likewise invoked this provision to deny Felipe's application, contending that the North Carolina district court failed to make such a finding, and that even if it had, the temporary nature of the order meant that the court could make no finding that reunification was "permanently not viable." See J.A. 27. The first Agency contention is simply false, however, because the North Carolina court did make a finding that reunification was not viable. See id . at 129. The requirement that such a finding must invoke permanence appears to stem from the Agency's general interpretation that the custody element of an SIJ application requires a permanent order, which is discussed further herein.

In North Carolina and elsewhere, in loco parentis relationships arise in the absence of formal custody determinations, and thus describe a different legal context and status. See State v. Benitez , 810 S.E.2d 781, 790-91 (N.C. Ct. App. 2018).

Under North Carolina law, the district courts possess jurisdiction over proceedings concerning child custody. See N.C. Gen. Stat. § 7A-244.

In according deference to a state court's determination of custody issues, it is incumbent on the federal courts to simply accept and recognize such orders and the factual findings made therein. Neither our Court nor the Agency is entitled to sit as a reviewing court for the North Carolina district court. Unfortunately, my colleagues stray into such uncertain and untravelled territory by questioning Felipe's intent in seeking his custody order and by criticizing the state court's conclusions regarding its own jurisdiction. See ante at 855 n.7. And they do so as they defend principles of federalism. See id . Properly applying such principles, however, the federal courts ought not interfere in facially valid domestic relations rulings of the state courts. See Ojo , 813 F.3d at 541.

Of greater concern, the Agency's categorical rejection of temporary custody orders for SIJ applicants logically extends beyond North Carolina to valid child custody orders of other states as well.