**ON REHEARING EN BANC**

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1330**

FELIPE PEREZ PEREZ,

        Plaintiff – Appellant,

    v.

KENNETH T. CUCCINELLI, Senior Official Performing the Duties of the Director, United States Citizenship and Immigration Services,

        Defendant – Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad Jr., District Judge. (3:16-cv-00748-RJC-DSC)

Argued: September 19, 2019             Decided: February 10, 2020

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

Reversed and remanded by published opinion. Judge King wrote the majority opinion, in which Chief Judge Gregory and Judges Motz, Keenan, Wynn, Diaz, Floyd, Thacker, and Harris joined. Judge Quattlebaum wrote a dissenting opinion, in which Judges Wilkinson, Niemeyer, Agee, Richardson, and Rushing joined.

**ARGUED:** Bradley Bruce Banias, BARNWELL WHALEY PATTERSON & HELMS, LLC, Charleston, South Carolina, for Appellant. Scott Grant Stewart, UNITED STATES

DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Chad A. Readler, Acting Assistant Attorney General, William C. Peachey, Director, Brian Ward, Senior Litigation Counsel, Sheetul S. Wall, District Court Section, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

KING, Circuit Judge:

In late 2013, at the age of sixteen, plaintiff Felipe Perez Perez fled his home country of Guatemala. Upon his arrival in the United States in early 2014, Felipe was apprehended by U.S. Customs and Border Protection and eventually released to his older brother, Mateo Perez Perez, who resided in North Carolina. In January 2015, Mateo sought legal custody of Felipe in a North Carolina court, alleging that Felipe had been abused, neglected, and abandoned by their biological parents. It was not until June 2015 that the court acted on Mateo's custody petition. At that point, the court conducted an *ex parte* hearing, granted Mateo emergency temporary custody of Felipe, and scheduled a hearing to consider permanent custody. Shortly thereafter, Felipe turned eighteen (North Carolina's age of majority), and the court thus cancelled the second hearing and never entered a permanent custody order.

In July 2015, Felipe applied for special immigrant juvenile ("SIJ") status with U.S. Citizenship and Immigration Services ("USCIS," or the "Agency"). SIJ status is a classification under the Immigration and Nationality Act (the "INA") that permits an immigrant to pursue lawful permanent residence and, potentially, United States citizenship. As codified at 8 U.S.C. § 1101(a)(27)(J) (the "SIJ provision"), the INA specifies that an immigrant may qualify for SIJ status if, inter alia, "a juvenile court located in the United States" has "placed [him] under the custody of" "an individual" and "reunification with 1 or both of [his] parents is not viable." *See* 8 U.S.C. § 1101(a)(27)(J)(i). Notwithstanding the absence of any express permanency requirement in the SIJ provision, USCIS has interpreted clause (i) to require a permanent custody order. On that basis, the Agency

3

denied Felipe's SIJ application in September 2015 and dismissed his administrative appeal of that denial in May 2016.

Felipe sought judicial review of the Agency's rejection of his SIJ application, initiating these proceedings in October 2016 in the Western District of North Carolina against the Director of USCIS.[1] In March 2018, the federal district court denied Felipe's motion to set aside the Agency's final action and granted the summary judgment motion of USCIS. Felipe then timely noted this appeal from the judgment of the district court. Unlike that court, we conclude that the Agency's interpretation of the SIJ provision — that clause (i) requires a permanent custody order — is entitled to no deference, defies the plain statutory language, and impermissibly intrudes into issues of state domestic relations law. Consequently, we reverse the judgment and remand with instructions to grant Felipe's motion to set aside the Agency's final action denying him SIJ status.

I.

Pursuant to the SIJ provision of the INA, an SIJ is "an immigrant who is present in the United States":

(i)     who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

---

[1] Felipe sued the Director of USCIS in his official capacity. Rather than naming the Director, we refer herein to the defendant as "USCIS," or the "Agency."

(ii)    for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

(iii)    in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]

*See* 8 U.S.C. § 1101(a)(27)(J). These proceedings focus on what clause (i) means in defining an SIJ as an immigrant "whom [a juvenile court located in the United States] has . . . placed under the custody of[] . . . an individual . . . and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." *See id.* § 1101(a)(27)(J)(i). As USCIS has interpreted it, clause (i) requires a finding of the permanent non-viability of an SIJ applicant's reunification with one or both parents and, hence, a permanent custody order.

## II.

### A.

On January 20, 2015, Mateo Perez Perez filed a verified complaint in the District Court of Mecklenburg County, North Carolina, seeking both temporary and permanent custody of his brother Felipe Perez Perez on the ground that Felipe had been abused, neglected, and abandoned by their biological parents. *See* N.C. Gen. Stat. § 7A-244 (specifying that state district courts possess jurisdiction over child-custody proceedings). In his complaint, Mateo also requested that the state court make findings necessary to Felipe's application for SIJ status. *See* 8 C.F.R. § 204.11(d)(2) (requiring SIJ applicant to

5

submit juvenile court order containing such findings).  Within the ensuing five months, the court having not acted upon the complaint, Mateo filed a motion for emergency temporary custody of Felipe.

By its Order Granting Ex Parte Temporary Custody of June 29, 2015, the state court awarded custody of Felipe to Mateo pursuant to section 50A-204 of the General Statutes of North Carolina.  *See Perez v. Perez*, No. 15-CVD-1127 (N.C. Dist. Ct. June 29, 2015) (the "Custody Order"); *see also* N.C. Gen. Stat. § 50A-204(a) (conferring "temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse").  In so doing, the court outlined findings of fact and conclusions of law supporting the custody award.  *See* Custody Order 1-3.

As reflected in the state court's findings of fact, Felipe was born on July 6, 1997, to Guatemalan parents.  *See* Custody Order 1.  The court further determined that, between 2005 and 2013 — from age eight to sixteen — Felipe was "abandoned, neglected, and abused" by his biological parents, who failed "to provide safety, shelter, and food for him." *Id.* at 2.  More specifically, the court found the following:

> Upon information from the minor child, Felipe was told that school was not an option as it would not feed him, and he was therefore not allowed to go to school.  He did not learn Spanish.  Instead he learned a language spoken in the mountains known as "Chu."  Since Felipe's parents did not work, all of the minor children were obligated to work.  His younger sisters worked selling food and at the age of 8, Felipe began to work at his father's terrain in the mountains doing all types of field work.  Despite the weather conditions in the mountains, Felipe would get sick at times since he only had one change of clothes, which he had to wash by hand.  The clothes were not adequate for cold or wet weather.  Felipe was obligated to walk to and from work which was about 1 hour away.  He worked from 5am-6pm, 6 days a

6

week, with only half a day off on Sundays and was allowed only 1 meal a day. After Felipe's younger sister brought Felipe his daily meal, Felipe would walk his sibling back to her work and return to his. He was constantly punished for not finishing his work . . . on time. Drunk or sober, his father was vulgar and verbally abusive by telling Felipe that he was worthless. He pulled on Felipe's ears[] and hair and also beat him with cables. The young child could not fight back, in fear of worsening the situation. The father hit [Felipe] with a belt over his face and left him a scar. The abuse occurred about 2-3 times a week. The mother never did anything to stop the abuse from occurring. When the family held parties, the adults would drink heavily so Felipe would spend the night at his uncle's house to prevent any more beatings.

*Id.* According to the court, the abandonment, abuse, and neglect by his parents "forced [Felipe] to migrate to the United States to seek refuge with [his older brother Mateo]," in whose care Felipe "has been safe," "attend[ing] school," and "learning English." *Id.* By contrast, "[i]f forced to return to Guatemala, [Felipe] would be completely on his own and without the proper family support system." *Id.*

Among its corresponding conclusions of law, the state court ruled that "[a]n emergency situation exists that affects the welfare of [Felipe]" and that "it is in the best interest of [Felipe] that his care, custody, and control be awarded to [Mateo]." *See* Custody Order 3. Relevant to the requirements set forth in clauses (i) and (ii) of the SIJ provision, the court specified that "it is [in Felipe's] best interest for temporary and permanent custody to be awarded to [Mateo]"; that "[r]eunification with the biological parents is not viable due to abuse, neglect, abandonment, or a similar basis found under state law"; and that "it is not in [Felipe's] best interest to return to Guatemala." *Id.*

The Custody Order announced that a hearing regarding permanent custody would be held on July 22, 2015, and directed that notice be provided to Felipe's biological parents,

7

as required by North Carolina law prior to the termination of parental rights. *See* N.C. Gen. Stat. § 7B-1101. But on July 6, 2015, Felipe turned eighteen, which divested the state court of jurisdiction over his custody case. *See id.* § 50A-102(2) (defining a "child," for purposes of child-custody determinations, as "an individual who has not attained 18 years of age"). As a result, the July 22, 2015 hearing was cancelled.

B.

In the meantime, on or shortly before his eighteenth birthday, Felipe applied for SIJ status. *See* 8 C.F.R. § 204.11(c)(1) (specifying that SIJ applicant must be "under twenty-one years of age"). Felipe's application attached the Custody Order to satisfy the requirements of clauses (i) and (ii) of the SIJ provision. Pertinent to clause (i), Felipe submitted the Custody Order as proof that "a juvenile court located in the United States" has "placed [him] under the custody of" "an individual [Mateo]" and that "reunification with 1 or both of [his] parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." *See* 8 U.S.C. § 1101(a)(27)(J)(i).

On July 31, 2015, USCIS issued Felipe a Notice of Intent to Deny his SIJ application (the "USCIS Notice"). Therein, the Agency identified various deficiencies it linked to clauses (i), (ii), and (iii), and it accorded Felipe thirty-three days to submit rebuttal evidence. With respect to clause (i), the USCIS Notice deemed the Custody Order defective because it "is expressly temporary in nature and does not make a finding that reunification with one or both parents is permanently not viable." *See* USCIS Notice 2. The Agency failed to identify any authority in support of its view that clause (i) requires a finding of the permanent non-viability of reunification and a permanent custody order.

8

C.

After receiving the USCIS Notice, Felipe and Mateo returned to the North Carolina district court and obtained an Order for Judgment Nunc Pro Tunc of August 28, 2015. *See Perez v. Perez*, No. 15-CVD-1127 (N.C. Dist. Ct. Aug. 28, 2015) (the "Nunc Pro Tunc Order"). The Nunc Pro Tunc Order explained that, "[b]ecause [Felipe] turned 18 years old . . . after the signing of the [Custody] Order, [that] Order granting temporary custody to [Mateo] was as permanent as possible under North Carolina Law." *Id.* at 1. Felipe submitted the Nunc Pro Tunc Order to USCIS as rebuttal evidence.

Nevertheless, by its Decision of September 23, 2015 (the "USCIS Decision"), USCIS denied Felipe's SIJ application. Although the USCIS Decision included some discussion of clauses (ii) and (iii), the Agency premised the denial on clause (i) alone. Like the USCIS Notice, the USCIS Decision interpreted clause (i) — without citation to any authority — as requiring a finding of the permanent non-viability of an SIJ applicant's reunification with one or both of his parents and a permanent custody order. In that regard, the USCIS Decision echoed the USCIS Notice by deeming the Custody Order defective because it "is expressly temporary in nature and does not make a finding that reunification with one or both parents is permanently not viable." *See* USCIS Decision 2. Then, the USCIS Decision declared the Nunc Pro Tunc Order unhelpful to Felipe, reasoning that it "does not overcome the fact that the [Custody Order] is expressly temporary in nature and therefore does not make the finding that reunification with one or both parents is permanently not viable." *Id.* at 3. Finally, in stating its conclusion, the USCIS Decision reiterated that Felipe is not eligible for SIJ status because the Custody Order "is expressly

9

temporary in nature and does not make a finding that reunification with one or both parents is permanently not viable." *Id.*

Felipe thereafter sought a de novo review of the USCIS Decision by the Agency's Administrative Appeals Office (the "AAO"). By its Decision of May 9, 2016 (the "AAO Decision"), the AAO upheld the denial of Felipe's SIJ application and dismissed his appeal. The AAO Decision characterized the USCIS Decision as resting on the conclusion, connected to clause (i), that Felipe "was not eligible for SIJ classification because the [Custody Order] was temporary and, therefore, did not make a permanent finding of non-viability-of-reunification with one or both of [Felipe's] parents." *See* AAO Decision 1. The AAO Decision endorsed that conclusion, subscribing to the view that clause (i) requires a finding of the permanent non-viability of reunification and, hence, a permanent custody order. As before, the Agency cited no authority to support its interpretation of clause (i), and it made clear that the fundamental defect in the Custody Order is simply that the order is not a permanent one. *See id.* at 3 (explaining that the Custody Order "was not a qualifying juvenile court order under [clause (i)] at the time it was issued because there was no finality to the proceedings"); *id.* at 4 (elaborating that the Nunc Pro Tunc Order, which deemed the temporary Custody Order "as permanent as possible," is insufficient to "cure [the Custody Order's] lack of qualification [under clause (i)]").[2]

---

[2] Although the AAO Decision principally faulted the Custody Order for not being a permanent order, the AAO Decision also suggested that the Custody Order did not constitute a "custody determination" under North Carolina law. Specifically, the AAO Decision observed that the North Carolina district court "invoked its emergency jurisdiction under [section 50A-204 of the General Statutes of North Carolina]" and that (Continued)

D.

On October 28, 2016, Felipe initiated these proceedings against USCIS in the Western District of North Carolina. Felipe's Complaint seeks a court order setting aside the Agency's denial of his SIJ application and declaring unlawful the Agency's interpretation of clause (i) of the SIJ provision as requiring a permanent custody order. The Complaint includes claims under the Administrative Procedure Act (the "APA") and the Full Faith and Credit Clause of the Constitution. On April 4, 2017, Felipe filed his motion to set aside the Agency's final action, and on May 5, 2017, USCIS filed its motion for summary judgment.

By its Order of March 7, 2018, the federal district court resolved to award judgment to USCIS. *See Perez v. Rodriguez*, No. 3:16-cv-00748 (W.D.N.C. Mar. 7, 2018), ECF No. 21 (the "District Court Order"). In assessing Felipe's APA claim, the court accorded deference to the Agency's interpretation of clause (i) and characterized it as "well supported." *Id.* at 8-9. As the court put it, clause (i) "requires a proper final declaration

---

the Custody Order is thus a "'temporary protective order[] only.'" *See* AAO Decision 3 (quoting *In re Brode*, 566 S.E.2d 858, 860 (N.C. Ct. App. 2002) (recognizing that, "[w]hen a court invokes emergency jurisdiction, any orders entered shall be temporary protective orders only")). The AAO Decision then asserted that "the underlying deficiency of the [Custody Order] is that [it] was obtained through a proceeding that allows a juvenile court to take temporary jurisdiction over a child when necessary in an emergency to protect the child and defers custody determinations to a subsequent hearing." *Id.* Additionally, the AAO Decision indicated that the Custody Order merely allowed Mateo to act *in loco parentis* pending future custody proceedings and was thereby insufficient to satisfy clause (i). *See id.* at 3-4 (citing 8 U.S.C. § 1232(d)(5) for the proposition "that an individual appointed by a juvenile court located in the United States, acting in *loco parentis*, shall not be considered a legal guardian for purposes of [the SIJ provision]").

11

from a state juvenile court" and disallows "temporary orders established through emergency *ex parte* hearings." *Id.* Additionally, the court rejected Felipe's alternative theory of his APA claim — that, accepting the Agency's interpretation of clause (i), the Agency yet acted arbitrarily and capriciously by failing to deem the Custody Order permanent. *Id.* at 9-10. The court also rejected Felipe's separate claim under the Full Faith and Credit Clause. *Id.* at 10-11. Accordingly, the court denied Felipe's motion to set aside the Agency's final action, granted USCIS's summary judgment motion, and directed that this case be closed. *Id.* at 12. The judgment was entered that same day. *See Perez v. Rodriguez*, No. 3:16-cv-00748 (W.D.N.C. Mar. 7, 2018), ECF No. 22.

Argument in this appeal was initially heard by a three-judge panel that affirmed the district court's judgment by a split decision. *See Perez v. Cissna*, 914 F.3d 846 (4th Cir. 2019). Felipe sought rehearing en banc, however, and a majority of this Court's judges in active service voted to grant Felipe's petition. The panel's decision was thereby vacated, and our en banc Court now reviews anew the judgment of the district court. *See* 4th Cir. R. 35(c).

III.

Our focus is on Felipe Perez Perez's APA claim — particularly his challenge to USCIS's dispositive interpretation of clause (i) of the SIJ provision as requiring a permanent custody order. We review the district court's resolution of the APA claim de novo. *See Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014). Relevant here, the APA authorizes a court to set aside an agency action if it is "arbitrary,

12

capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). Because USCIS denied Felipe's SIJ application on the basis of the Agency's interpretation of clause (i), we must decide whether that interpretation is "not in accordance with law," bearing in mind that it is our duty under the APA to "decide all relevant questions of law" and to "interpret constitutional and statutory provisions." *See id.* § 706.

As part of our inquiry, however, we must consider whether USCIS's clause (i) interpretation merits any deference. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109-10 (2015). Needless to say, if statutory language is clear and unambiguous, an agency's interpretation thereof is not entitled to deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

As explained below, we are satisfied that USCIS's interpretation of clause (i) is not entitled to deference and is not in accordance with law. In our analysis, we first address how the Agency's interpretation defies the plain statutory language. Next, we highlight ways in which USCIS has impermissibly intruded into issues of state domestic relations law. And finally, we explain why the Agency's interpretation would not be eligible for deference even if the statutory language were ambiguous. In the end, we reverse the district court's judgment and remand with instructions to grant Felipe's motion to set aside the Agency's final action. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (explaining that,

"if the action [under review] is based upon a determination of law as to which the reviewing authority of the courts [comes] into play, an order may not stand if the agency has misconceived the law"); *see also PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) ("[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards.").[3]

A.

The precise question before us is whether USCIS correctly concluded that Congress intended to impose a requirement for a permanent custody order when it defined an SIJ as an immigrant "whom [a juvenile court located in the United States] has . . . placed under the custody of[] . . . an individual . . . and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." *See* 8 U.S.C. § 1101(a)(27)(J)(i). That is, we evaluate the Agency's view that clause (i) of the SIJ provision requires a finding of the permanent non-viability of the applicant's reunification with one or both of his parents and, hence, a permanent custody order.

---

[3] According to Felipe, USCIS's improper interpretation of the SIJ provision — the misreading of clause (i) to require a permanent custody order — constitutes an "ultra vires" agency action. Felipe's phraseology is appropriate. As the Supreme Court has explained and we have reiterated, "because the power of administrative agencies (unlike courts) is prescribed entirely by statute, *any* 'improper[]' agency action is 'ultra vires.'" *See United States v. Cortez*, 930 F.3d 350, 357 (4th Cir. 2019) (alteration in original) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)).

14

Utilizing ordinary rules of statutory construction, we conclude that the language of clause (i) is clear and unambiguous that neither a finding of the permanent non-viability of reunification nor a permanent custody order is required. Thus, we accord USCIS's contrary interpretation no deference and recognize that, by defying the plain statutory language, that interpretation is not in accordance with law. *See Prudencio v. Holder*, 669 F.3d 472, 480 (4th Cir. 2012) ("If, using traditional tools of statutory construction, we determine that Congress manifested an intention on the precise question [at issue], such intention must be given effect and the analysis concludes." (citing *Chevron*, 467 U.S. at 842-43 & n.9)).

1.

With respect to the finding of non-viability of reunification required by the SIJ provision's clause (i), we apply the "fundamental canon of statutory construction . . . that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *See United States v. Mills*, 850 F.3d 693, 697 (4th Cir. 2017) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Clause (i) simply requires a finding that "reunification with 1 or both of the [SIJ applicant's] parents *is* not viable." *See* 8 U.S.C. § 1101(a)(27)(J)(i) (emphasis added). That clearly and unambiguously means reunification must be presently non-viable. Reunification need not be permanently, or everlastingly, or forever, non-viable. Nothing about clause (i)'s language, the context in which it is used, or the broader context of the SIJ provision as a whole suggests that "is" somehow equates with "will always be." *See Hately v. Watts*, 917 F.3d 770, 784 (4th Cir. 2019) ("To determine a statute's plain meaning, we not only look to the language itself, but also the specific context in which the language is used, and the broader context of the

15

statute as a whole. If the plain language is unambiguous, we need look no further." (internal quotation marks omitted)).

Our confidence that Congress did not intend for clause (i) to demand a finding of the permanent non-viability of reunification is bolstered by the fact that, if Congress had intended such a requirement, it easily could have said so. Indeed, the very paragraph of the INA containing the SIJ provision explicitly states a permanency requirement in another context. *See* 8 U.S.C. § 1101(a)(27)(H) (providing that immigrant seeking special status based on medical expertise must have been "permanently licensed to practice"). The omission of "permanent" or a like term from the SIJ provision in these circumstances is highly illuminating of congressional intent. *See United States v. Serafini*, 826 F.3d 146, 149 (4th Cir. 2016) (explaining that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))). Plainly, Congress did not intend to include a requirement in clause (i) for a finding of the permanent non-viability of reunification.

## 2.

By concluding that clause (i) of the SIJ provision does not require a finding of the permanent non-viability of an SIJ applicant's reunification with one or both of his parents, we reject the foundation of USCIS's theory that only a permanent custody order will satisfy clause (i). Nevertheless, we also consider whether clause (i) otherwise requires a permanent custody order. That inquiry entails ascertaining the meaning of the clause (i)

16

phrase "placed under the custody of," and particularly the term "custody" — an inquiry in which we are guided by our decision in *Ojo v. Lynch*, 813 F.3d 533 (4th Cir. 2016).

In *Ojo*, we reviewed an interpretation by the Board of Immigration Appeals of the term "adopted" found in another INA provision. *See* 813 F.3d at 539-41 (determining what it means to be "adopted while under the age of sixteen years," as required by 8 U.S.C. § 1101(b)(1)(E)(i)). We began by examining the plain language of the INA provision and, thus, the way "adopted," or the related term "adoption," is commonly defined and understood. *Id.* at 539. We recognized that "adoption" is defined as "the creation by judicial order of a parent-child relationship between two parties" and that "it is well understood that, in the United States, our various state courts exercise full authority over the judicial act of adoption." *Id.* (alteration and internal quotation marks omitted). Furthermore, "we discern[ed] no indication from the text of [the INA provision] — or from any other aspect of the statutory scheme created in the INA — that Congress intended to alter or displace the plain meaning of 'adopted.'" *Id.* at 539-40. On that basis, we concluded that "'adopted' . . . carries with it the understanding that adoption proceedings in this country are conducted by various state courts pursuant to state law" and that "a child is 'adopted' for purposes of [the INA provision] on the date that a state court rules the adoption effective." *Id.* at 540.

The *Ojo* decision proceeded to explain that our interpretation was confirmed by viewing the INA provision "in the broader context within which Congress legislates." *See* 813 F.3d at 540. As we outlined, "[a]lthough the Constitution commits to the federal legislature the power '[t]o establish an uniform Rule of Naturalization,' it has long been a

17

hallmark of our federalism principles that full authority over domestic-relations matters resides not in the national government, but in the several States." *Id.* (quoting Const. art. I, § 8, cl. 4). "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *Id.* (quoting *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890)). "To that end, 'the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations.'" *Id.* (quoting *United States v. Windsor*, 570 U.S. 744, 767 (2013)). And "the courts expect a 'clear indication' of congressional intent when an 'administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power.'" *Id.* (quoting *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001)). Viewing *Ojo*'s INA provision in that context, we were convinced that by choosing the simple "adopted" phrase — and by giving no indication that it "intended a modified definition of the term 'adopted' for purposes of federal immigration law" — Congress meant for "the effective date of the adoption" to be controlled by "the relevant state court instruments." *Id.* at 540-41.

Adhering to the *Ojo* approach here, we are satisfied that the term "custody," as used in the SIJ provision's clause (i), retains its ordinary meaning. Therefore, "custody" refers to the "care, control, and maintenance of a child awarded by a court to a responsible adult." *See* Custody, *Black's Law Dictionary* (10th ed. 2014). It "involves legal custody (decision-making authority) and physical custody (caregiving authority), and an award of custody [usually] grants both rights." *Id.* The accepted definition of "custody" contains no temporal requirements, so that custody may be granted for a period of days, months, or

18

years, on a temporary or permanent basis. Moreover, custody determinations are traditionally rendered by state courts applying state law. *See Thompson v. Thompson*, 484 U.S. 174, 186 (1988) (observing that custody orders involve "traditional state-law questions that [federal courts] have little expertise to resolve"). There is no indication anywhere in the INA, including the SIJ provision and clause (i) itself, that Congress intended to displace the common understanding of the term "custody." As that term is commonly understood, custody may be granted by a temporary or permanent order, according to the law of the pertinent State. Consequently, clause (i) clearly and unambiguously does not require a permanent custody order.[4]

## B.

We underscore that, in defying the plain language of the SIJ provision, USCIS's interpretation of clause (i) impermissibly intrudes into issues of state domestic relations law. Most prominently, the Agency's interpretation demands rulings — namely, a permanent custody order and a finding of the permanent non-viability of an SIJ applicant's reunification with one or both of his parents — that state juvenile courts may be unwilling

---

[4] Albeit not in the INA, Congress itself has defined a "custody determination" as a court order "providing for the custody of a child," including "permanent and temporary orders." *See* 28 U.S.C. § 1738A (requiring each State to respect the child-custody determinations of other States). Interpreting that statute in its *Thompson* decision, the Supreme Court ruled that § 1738A does not create a federal cause of action due to, inter alia, the primacy of state law in child-custody determinations. *See* 484 U.S. at 186-87. Section 1738A and the *Thompson* decision interpreting it together emphasize the lack of temporal requirements attached to the common understanding of the term "custody," as well as the continued deference owed by federal courts to state law and state courts in custody matters.

19

or unable to render. Even where such a court sees no prospect that an immigrant juvenile and his parents will ever reunite, the court may be reluctant to foreclose reunification or, in any event, may not be authorized by law to enter a permanent custody order or find that reunification is permanently non-viable. But under USCIS's clause (i) interpretation, a state juvenile court may have to choose between, on the one hand, exercising its full discretion and authority in child-custody matters and, on the other hand, unduly disqualifying an immigrant juvenile from SIJ status.

Of particular relevance here, North Carolina's Uniform Child-Custody Jurisdiction and Enforcement Act expressly includes permanent and temporary orders in its definition of a "child-custody determination." *See* N.C. Gen. Stat. § 50A-102(3) (defining a "child-custody determination" as a court order "providing for the legal custody, physical custody, or visitation with respect to a child," which may be "a permanent, temporary, initial, [or] modification order"). And in North Carolina, both permanent and temporary custody orders remain subject to modifications found to be "in the best interests of the child." *See Woodring v. Woodring*, 745 S.E.2d 13, 17-18 (N.C. Ct. App. 2013) (explaining that a permanent custody order "may not be modified unless the trial court [also] finds there has been a substantial change in circumstances affecting the welfare of the child," whereas a temporary custody order can be modified anytime "the modification is in the best interests of the child").

As such, it does not appear that a North Carolina court could ever make a proper finding of the permanent non-viability of reunification between an immigrant juvenile and his parents, even in a permanent custody order. It certainly is not the place of USCIS to

20

intrude into issues of North Carolina law and tell the court that it must find the permanent non-viability of reunification and issue a permanent custody order, lest it render the immigrant juvenile ineligible for SIJ status.[5]

C.

Finally, we emphasize that — even if the pertinent statutory language were ambiguous — USCIS's interpretation of clause (i) of the SIJ provision would not be eligible for deference. *Cf. Romero v. Barr*, 937 F.3d 282, 295 (4th Cir. 2019) (explaining that, "even if we were to assume that the regulations [at issue] were ambiguous, . . . the Attorney General's reading of the regulations does not warrant deference").

1.

Pursuant to the Supreme Court's decision in *Chevron*, a federal court may defer to an agency's "reasonable interpretation" of an ambiguous statutory provision. *See* 467 U.S. at 844. It is only appropriate for a court to confer the considerable deference available under the *Chevron* doctrine, however, if the agency possesses congressionally delegated

---

[5] To the extent that the AAO Decision concluded the Custody Order granting emergency temporary custody of Felipe to his brother Mateo Perez Perez did not constitute a "custody determination" at all, *see supra* note 2, the Agency wholly misperceived North Carolina law. The pertinent North Carolina jurisdictional provision explicitly conferred on the District Court of Mecklenburg County the power to award temporary custody. *See* N.C. Gen. Stat. § 50A-204 (contemplating that "a child-custody determination [will be] made under this section" that may "become[] a final determination"). As the *In re Brode* decision of the Court of Appeals of North Carolina reflects, an order issued under section 50A-204 is a "temporary protective order[] only," but it is a temporary custody order. *See* 566 S.E.2d 858, 860 (N.C. Ct. App. 2002). Thus, USCIS was wrong to suggest that the Custody Order did not grant Mateo custody of Felipe or that Mateo was merely appointed to act *in loco parentis*. Simply put, there is nothing in North Carolina law to even suggest that an award of emergency temporary custody does not, in fact, confer custody.

21

authority "to make rules carrying the force of law" and if "the agency interpretation claiming deference was promulgated in the exercise of that authority." *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Such congressionally delegated authority is typified by the agency's power to engage in notice-and-comment rulemaking or formal adjudications. *See id.* at 230 & n.12 (listing decisions involving rulemaking and adjudications that qualified for *Chevron* deference).

Significantly, USCIS did not arrive at its understanding of clause (i) of the SIJ provision through either notice-and-comment rule-making, a formal adjudication, or some other means evincing an application of congressionally delegated authority to make rules carrying the force of law. The Agency merely pronounced its clause (i) interpretation in the USCIS Decision and AAO Decision denying Felipe's SIJ application (together, the "Agency Decisions"). It is thus clear that USCIS's clause (i) interpretation would not qualify for the significant deference offered under the *Chevron* doctrine. *See Mead*, 533 U.S. at 226-27.[6]

---

[6] The district court ruled that USCIS's interpretation of clause (i) is entitled to *Chevron* deference, as well as deference under *Auer v. Robbins*, 519 U.S. 452 (1997). *See* District Court Order 8-9. As the Supreme Court recently emphasized, however, *Auer* deference applies solely to an agency's interpretation of its own ambiguous regulation and, even then, only in narrow circumstances. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). *Auer* deference cannot apply here because the Agency Decisions did not invoke any regulation — or any authority whatsoever — in pronouncing that clause (i) requires a permanent custody order.

2.

Absent eligibility for *Chevron* deference, agency interpretations are only "given a level of respect commensurate with their persuasiveness." *See Ramirez v. Sessions*, 887 F.3d 693, 701 (4th Cir. 2018). Under the doctrine announced by the Supreme Court in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), an agency's "'specialized experience'" may justify granting its statutory interpretation a degree of deference "proportional to its 'power to persuade.'" *See Mead*, 533 U.S. at 234-35 (quoting *Skidmore*, 323 U.S. at 139-40). In applying *Skidmore* deference, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Id.* at 228 (footnotes omitted).

The markers of persuasiveness established by *Skidmore* and its progeny simply do not urge any deference to USCIS's interpretation of clause (i). Nothing about the Agency Decisions indicates that USCIS arrived at its clause (i) interpretation by way of a careful analysis or a reliance on expertise. The Agency Decisions neither explained USCIS's reasoning nor identified any supporting authority, including any consistent ruling from the Agency.

Furthermore, the narrow and restrictive interpretation of clause (i) in the Agency Decisions is generally incongruous with Congress's efforts to expand eligibility for SIJ status and increase protections for vulnerable immigrant children. As first enacted in 1990, the SIJ provision limited eligibility for SIJ status to children who have "been declared dependent on a juvenile court located in the United States" and have "been deemed eligible by that court for long-term foster care." *See* Immigration Act of 1990, Pub. L. No. 101-

23

649, § 153, 104 Stat. 4978, 5005-06 (1990). The subsequent amendments to the SIJ provision have included revisions made by way of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "2008 TVPRA"). *See* Pub. L. No. 110-457, 122 Stat. 5044 (2008). Those revisions were included in a section of the 2008 TVPRA aimed at enhancing efforts to combat the trafficking of children, particularly unaccompanied immigrant minors. *See id*. § 235, 122 Stat. at 5074-82. A subsection titled "Permanent Protection for Certain At-Risk Children" substantively amended the SIJ provision into essentially its present form. *Id*. § 235(d)(1), 122 Stat. at 5079-80.

Pertinent here, in clause (i) of the SIJ provision, the 2008 TVPRA expanded eligibility for SIJ status to include children who had been placed by a court under the custody of an individual. It also eliminated the requirement that an SIJ applicant be deemed eligible for long-term foster care and instead more generously conditioned eligibility on the non-viability of the applicant's reunification with one or both parents. USCIS has sought to frustrate the 2008 TVPRA's aim of qualifying more immigrant children for SIJ status, however, by pronouncing in the Agency Decisions that an SIJ applicant placed under the custody of an individual must present a permanent custody order and a finding of the permanent non-viability of reunification.[7]

---

[7] Notably, the regulations implementing the SIJ provision have not been updated to reflect the significant changes wrought by the 2008 TVPRA, although USCIS proposed new rules in 2011. *See* Special Immigrant Juvenile Petitions, 76 Fed. Reg. 54,978 (proposed Sept. 6, 2011) (to be codified at 8 C.F.R. pts. 204, 205, 245). The proposed rules in no way articulated a requirement for a permanent custody order. Rather, the proposed rules simply required a custody order "in effect at the time of filing [the SIJ application] and continu[ing] through the time of adjudication, unless the age of the [applicant] prevents (Continued)

* * *

In sum, the clause (i) interpretation in the Agency Decisions would not be entitled to *Chevron* deference, having not been derived through notice-and-comment rulemaking, a formal adjudication, or some other means evincing the exercise of congressionally delegated authority to make rules carrying the force of law. Nor would that interpretation merit *Skidmore* deference, in that the Agency has not demonstrated the carefulness, expertise, or consistency that would imbue its interpretation with the power to persuade. And in any event, the Agency Decisions' clause (i) interpretation defies the plain statutory language, impermissibly intrudes into issues of state domestic relations law, and therefore is not in accordance with law.

IV.

Although several of our good colleagues join in a dissenting opinion today, they do not defend USCIS's interpretation of clause (i) of the SIJ provision as requiring a permanent custody order. Instead, the dissent denies the reality that the Agency rejected Felipe Perez Perez's SIJ application on the bare premise that he was obliged, but failed, to present a permanent custody order and a corresponding finding of the permanent non-viability of reunification with one or both of his parents. Strikingly, even the portions of the Agency Decisions quoted in the dissent make clear that USCIS imposed a categorical

such continuation." *Id.* at 54,979. The proposed rules also stated — with no reference to permanent non-viability — that the applicant must be "the subject of a . . . court determination that reunification with one or both parents is not viable." *Id.*

25

requirement for a permanent custody order. *See, e.g.*, *post* 37 (acknowledging that the Agency pronounced the Custody Order deficient because it "is expressly temporary in nature and therefore does not make the finding that reunification with one or both parents is permanently not viable" (quoting USCIS Decision 3)). Yet the dissent insists that the Agency conducted an individualized assessment of Felipe's SIJ application.

As the dissent has reshaped them, the Agency Decisions deemed Felipe's Custody Order insufficient under clause (i) not simply because it is temporary, but specifically because it was awarded in emergency *ex parte* proceedings. Of course, the Agency Decisions did not state such a rationale or otherwise articulate that a temporary custody order could ever be sufficient. So, the dissent is left to rely on inferences it draws from the Agency Decisions "read in their totality" that those Decisions turned on the fact that the Custody Order resulted from an *ex parte* hearing. *See post* 40. The dissent also treats as significant USCIS's feeble assertion, when prodded at oral argument before our en banc Court, that it is possible some other temporary custody order may somehow and someday satisfy clause (i). At bottom, the dissent rests on a house of cards and reviews not what the Agency Decisions actually said, but what our dissenting colleagues suggest those Decisions could have and should have said.

Concomitantly, the dissent rewrites our majority opinion in order to criticize it — in quite dramatic terms — as an assault on both the authority of USCIS and the rights of foreign parents. According to the dissent, we require USCIS to "bury its head in the sand" and "ignore [a custody] order's terms and the circumstances under which it was obtained" whenever the "order contain[s] certain magic words." *See post* 31 (footnote omitted). The

26

dissent further proclaims that we "sanction" Felipe's use of "courts in the United States to terminate the custodial rights of his parents living in another country with a motion they did not even know about." *See id.* at 32-33 (asserting that "[i]f another country did this to American parents, there would be universal and justifiable outrage").

Contrary to the dissent, our opinion narrowly and straightforwardly rejects USCIS's interpretation of clause (i) as requiring a permanent custody order, and we thus remand for further consideration of Felipe's SIJ application. We do not identify any "magic words" that guarantee SIJ status, and we do not command that such status be awarded to Felipe or anyone else. Moreover, we do not — and cannot — endorse the termination of Felipe's parents' parental rights in *ex parte* proceedings for the simple reason that those rights were not in fact terminated by the temporary Custody Order issued by the North Carolina district court. As such, the dissent's criticisms rest on versions of our opinion and of the facts that the dissent creates from whole cloth. Apparently, our dissenting colleagues need to be reminded of the words of Founding Father John Adams during his successful defense of British soldiers charged in the Boston Massacre: "Facts are stubborn things . . . and whatever may be our wishes, our inclinations, or the dictums of our passions, they cannot alter the state of facts and evidence." *See* David McCullough, *John Adams* 52 (Simon & Schuster 2001).

Perhaps the most egregious aspect of the dissent is that it accuses us of "plac[ing] this Court's stamp of approval on a brazen scheme to game our federal immigration system." *See post* 32. That is, despite the lack of any determination from the North Carolina district court or even from USCIS that Felipe has acted dishonestly or corruptly,

27

the dissent boldly declares that Felipe engaged in an "obvious manipulation of the state juvenile court to circumvent federal immigration laws." *See id.* The dissent specifically finds that Felipe "used, at best, dubious claims of an emergency to obtain an *ex parte* order at a time close enough to his eighteenth birthday that the order would never receive a proper review." *See id.* And, as if it demonstrates bad intent, the dissent points to the request in Mateo Perez Perez's complaint for custody of his brother Felipe "that the North Carolina court make the precise findings that would permit [Felipe] to apply for SIJ status and then apply for a permanent visa to remain in the United States." *See id.* at 34 (commenting that the "benefits [of obtaining SIJ status] were far from lost on [Felipe]").

The dissent's endeavor to demonize Felipe is wholly inappropriate, unfair, and dispiriting. First of all, the principle "that appellate courts do not make factual findings" is an "axiomatic" one. *See Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 419 (4th Cir. 2010) (citing *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 575-76 (4th Cir. 1995) ("It is a basic tenet of our legal system that, although appellate courts often review facts found by a judge or jury . . . , they do not make such findings in the first instance.")). The dissent's fact finding is particularly objectionable here because it tramples upon the exclusive authority of the North Carolina district court to adjudicate Felipe's custody. *See Adoptive Couple v. Baby Girl*, 570 U.S. 637, 656 (2013) (Thomas, J., concurring) (emphasizing that "domestic relations is an area that has long been regarded as a virtually exclusive province of the States" (internal quotation marks omitted)); *cf. Ojo v. Lynch*, 813 F.3d 533, 539 (4th Cir. 2016) (explaining that "it is well understood that, in

28

the United States, our various state courts exercise full authority over the judicial act of adoption").

Furthermore, the dissent's theory that Felipe acted dishonestly and corruptly is in no way compelled by the record. Indeed, many of the adverse inferences that the dissent draws against Felipe are patently unreasonable. For example, without acknowledging that Mateo filed his complaint for custody of Felipe nearly six months before Felipe turned eighteen, the dissent finds that Felipe plotted to obtain an unreviewable emergency custody order from the North Carolina district court within days of his eighteenth birthday. And although Felipe was required by federal regulation to submit to USCIS a state juvenile court order containing findings necessary to his SIJ application, *see* 8 C.F.R. § 204.11(d)(2), the dissent negatively cites the request for those findings made in Mateo's complaint for custody of Felipe. The dissent even maligns Felipe for appreciating the benefits of SIJ status, as if a mere desire to live in the United States is evidence of immigration fraud.

There is no justification for the dissent's dismal portrait of Felipe. The North Carolina district court certainly did not indicate that it thought itself manipulated in the custody proceedings, and USCIS did not attribute its rejection of Felipe's SIJ application to any chicanery. Rather, the state court gave every indication it believed that Felipe was the victim of abuse, neglect, and abandonment by his biological parents in Guatemala and that placing him in the custody of Mateo was in Felipe's best interests. Thereafter, USCIS denied Felipe SIJ status solely because he lacked the type of custody order — a permanent one — that the Agency has interpreted clause (i) of the SIJ provision to require. All we

say today is that, because USCIS's clause (i) interpretation is not in accordance with law, the Agency must take another look at Felipe's SIJ application.[8]

V.

Pursuant to the foregoing, we reverse the judgment of the district court and remand with instructions to grant Felipe Perez Perez's motion to set aside the Agency's final action. The court may conduct such other and further proceedings as are appropriate.

*REVERSED AND REMANDED*

---

[8] In these circumstances, unlike the dissent, we do not reach and assess the alternative theory of Felipe's APA claim or his claim under the Full Faith and Credit Clause.

QUATTLEBAUM, Circuit Judge, with whom Judges WILKINSON, NIEMEYER, AGEE, RICHARDSON, and RUSHING join, dissenting:

This should be a simple case. In accordance with 8 U.S.C. § 1101 (a)(27)(J) of the Immigration and Nationality Act (the "INA"), and its accompanying regulations, the United States Citizenship and Immigration Services (the "Agency") is required to review applications for special immigrant juvenile ("SIJ") status to ensure compliance with the statutory requirements. Here, the Agency did just that. It made a narrow decision, based on the record, that the *ex parte*, emergency order granting temporary custody of Felipe Perez Perez to his brother for a mere three weeks until a custody hearing with notice and due process could be held failed to satisfy the INA's requirements. In so doing, it carried out the duties expressly conferred on it by statute and explained its reasoning. As a result, we should apply the appropriate deferential standard of review which would require that the Agency's decision be affirmed.

But we, in adopting Perez's arguments, have cast aside the applicable standard of review under the Administrative Procedure Act ("APA") and substituted our judgment for that of the Agency. Under our reasoning, if a SIJ petitioner presents the Agency with an order containing certain magic words, it must—like the proverbial ostrich—bury its head in the sand[1] and ignore the order's terms and the circumstances under which it was

---

[1] This myth about ostriches, long since debunked, appears to have originated from *The Natural History*, written by Pliny the Elder in 77 A.D. In that work, Pliny wrote: "for although the rest of their body is so large, [ostriches] imagine, when they have thrust their head and neck into a bush, that the whole of their body is concealed." Pliny the Elder, THE NATURAL HISTORY OF PLINY 479 (John Bostock and H.T. Riley, trans.) (1855).

31

obtained. Importantly, in reversing the Agency's decision, we severely restrict the Agency in carrying out one of the duties Congress expressly conferred to it under the SIJ provisions of the INA—reviewing predicate state court orders of SIJ petitioners. And while our decision fortunately leaves intact the INA's provision requiring the Agency's consent to a SIJ petition (under which petitions with problems like those identified here can be properly rejected), we unnecessarily limit the Agency from doing one of the jobs Congress asked it to do.

Our justification for this deviation from our standard of review is a false premise—that the Agency imposed a blanket requirement that SIJ predicate custody orders must be permanent. However, try as one might, one will not be able to find any such sweeping requirement in either the Agency's decision or that of the Administrative Appeals Office ("AAO"). In fact, a review of those decisions reveals that the temporary nature of the state court order was just one of several factors upon which the Agency relied in concluding that the order did not satisfy the SIJ requirements under the INA. And without Perez's false premise, his argument should fail.

What's more, our decision places this Court's stamp of approval on a brazen scheme to game our federal immigration system. As explained below, Perez used, at best, dubious claims of an emergency to obtain an *ex parte* order at a time close enough to his eighteenth birthday that the order would never receive a proper review. This obvious manipulation of the state juvenile court to circumvent federal immigration laws should be condemned. Instead, we reward it in a way that will regrettably encourage others to do the same.

Making matters worse, this scheme not only manipulates the immigration laws passed by Congress, but it also has real victims—Perez's parents. Perez used courts in the United States to terminate the custodial rights of his parents living in another country with a motion they did not even know about. If another country did this to American parents, there would be universal and justifiable outrage. Yet today, we sanction just such a scenario.

For these reasons, I dissent.

## I.

Perez was born in Guatemala on July 6, 1997. He left his home in 2013. In January 2014, at the age of sixteen, he entered the United States illegally. The border authorities apprehended Perez and, in February 2014, transferred him to live with his brother in North Carolina pending his removal hearing.

In January 2015, about a year later, his brother filed a complaint in North Carolina state court seeking temporary and permanent custody over Perez and the termination of Perez's parents' custodial rights. In June 2015, just before Perez turned eighteen, his brother filed an *ex parte* motion seeking an order for temporary emergency custody asserting Perez faced actual abuse and neglect. In an affidavit filed with this motion, Perez or his brother (the record does not tell us) swore the emergency Perez faced was abuse and neglect by his parents. Significantly, however, at the time the motion was filed, Perez had been in the custody of his brother in the United States, approximately 2,700 miles away from his Guatemalan parents, for over a year and a half.

On June 29, 2015, based on the affidavit asserting an emergency, the North Carolina state court granted Perez's brother emergency temporary custody over Perez. The state court's findings were based solely on the *ex parte* affidavit without any opportunity for Perez's parents to respond. The order stated its terms would only remain in effect until July 22, 2015, just three weeks away. The court scheduled a custody hearing for that date to "determine custody of the minor child." J.A. 130. The order also required Perez's parents to be notified of the July 22 hearing.

As far as we know, neither Perez nor his brother provided such notice. And the July 22, 2015 hearing, which was scheduled to actually determine custody of the minor child, never happened. On July 6, 2015, just one week after the *ex parte* emergency order, Perez turned eighteen. Reaching the age of majority deprived the North Carolina juvenile court of jurisdiction over Perez. On the very day he turned eighteen, Perez took the emergency order, which he obtained without ever notifying his parents, to the Agency and petitioned for SIJ status.

The benefits of obtaining SIJ status can be substantial. For Perez, SIJ status makes him eligible for lawful permanent status, waiving potentially disqualifying facts such as his unlawful entry. In the initial complaint for child custody, in fact, Perez's brother made the specific request that the North Carolina court make the precise findings that would permit Perez to apply for SIJ status and then apply for a permanent visa to remain in the United States. These benefits were far from lost on Perez.

But before a petitioner like Perez can obtain SIJ status, he must submit a petition that is approved by the Agency for compliance with the SIJ requirements. The requirements

are found in the statutory definition of a SIJ. Under 8 U.S.C. § 1101 (a)(27)(J) of the INA,

an SIJ is "an immigrant who is present in the United States":

> (i)     who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;
> (ii)    for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and
> (iii)   in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.][2]

8 U.S.C. § 1101(a)(27)(J).

The SIJ definition can be broken down into two components. First, a petitioner must submit a predicate order that satisfies subsections (i) and (ii). The Agency is charged with reviewing the petition and the order for statutory compliance. Second, under subsection (iii), the Agency must consent to the petition. In exercising its statutory consent function, the Agency must review the juvenile court order and conclude that the request for SIJ classification is bona fide, which means the juvenile court order was actually sought to

---

[2] Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110–457, 122 Stat. 5044 (2008) which made significant amendments to the SIJ statute. Congress appropriately named the Act in honor of William Wilberforce, an influential English politician and social reformer. Although his story is unknown to far too many in the United States, Wilberforce's positive contributions are hard to overstate. Wilberforce's most well-known contribution was leading the effort to end slavery in England. Notable American figures like Abraham Lincoln and Frederick Douglass referred to Wilberforce as the pioneer of the abolitionist movement.

obtain relief from abuse, neglect, abandonment or a similar state law basis, rather than solely or primarily to obtain an immigration benefit. *See Reyes v. Cissna*, 737 F. App'x 140, 146 (4th Cir. 2018). Critically, both components are required.

In response to Perez's petition for SIJ status, on or around July 31, 2015, the Agency issued its Notice of Intent to Deny. It pointed out that the Agency must consent to the petition and noted concerns about the *ex parte*, emergency order. It explained:

> The Order Granting Ex Parte Temporary Custody is expressly temporary in nature and does not make a finding that reunification with one or both parents is permanently not viable. The order submitted specifically states that the terms of the order remain in effect until the next court date of July 22, 2015. The petitioner did not submit any subsequent court orders or any other evidence of additional custody determinations made by the juvenile court as evidence that the order is a permanent finding. Additionally, the court order does not make specific factual findings to support the statement that it is not in the best interest of the petitioner to be returned to Guatemala.

J.A. 85.

Attempting to salvage his petition, Perez returned to the North Carolina state court seeking another *ex parte* order. On August 28, 2015, the North Carolina juvenile court issued a second *ex parte* order, this time for judgment *nunc pro tunc*. That order found: (1) an action for *ex parte* temporary emergency child custody was instituted by Perez's brother; (2) an order granting *ex parte* temporary emergency child custody was granted on June 29, 2015; and (3) "[b]ecause the child turned 18 years old four days after the signing of the Order, the Order granting temporary custody to Plaintiff was as permanent as possible under North Carolina Law." J.A. 88. Perez supplemented his SIJ petition with this *nunc pro tunc* order.

36

On September 23, 2015, the Agency denied Perez's petition for SIJ status. The Agency repeated the concerns set forth in its Notice of Intent to Deny, but also explained the *nunc pro tunc* order "does not overcome the fact that the custody order submitted is expressly temporary in nature and therefore does not make the finding that reunification with one or both parents is permanently not viable." J.A. 27. It also held that "[t]he record is not sufficient to support USCIS's consent to SIJ status." J.A. 27.

After Perez appealed, the AAO reviewed the Agency's decision de novo and dismissed the appeal. In its decision, the AAO noted that the Act requires the Agency's consent. It then evaluated the orders submitted by Perez in the context of North Carolina appellate decisions on *ex parte*, emergency orders. Based on those decisions, it held "the *nunc pro tunc* order does not cure the underlying deficiency of the *ex parte* emergency order, which is that the *ex parte* emergency order was obtained through a proceeding that allows a juvenile court to take temporary jurisdiction over a child when necessary in an emergency to protect the child and defers custody determinations to a subsequent hearing." J.A. 22. It explained "[o]nly in the hearing scheduled for July 22, 2015, could the juvenile court have determined the viability of the Petitioner's reunification with one or both parents and the resulting custody issues." J.A. 22. Last, the AAO concluded, "[t]he Petitioner is ineligible for SIJ classification because the *ex parte* emergency order was not a qualifying juvenile court dependency order pursuant to section 101(a)(27)(J)(i) of the Act when it was issued and the *nunc pro tunc* order does not cure that lack of qualification." J.A. 23.

Perez later filed a complaint in the Western District of North Carolina against the Director of the Agency, seeking declaratory relief and review of the AAO's decision under the APA. Perez moved to set aside final agency action claiming the Agency and the AAO imposed an *ultra vires* requirement that the predicate custody order required by the SIJ application process be permanent. Alternatively, Perez argued the Agency and AAO acted arbitrarily or capriciously in differentiating between temporary emergency custody orders and permanent custody orders. The Agency moved for judgment on the record affirming the denial of the SIJ application.

The district court rejected Perez's claims. In concluding that the *ex parte*, emergency custody order did not satisfy the SIJ statute, the district court found that the Agency and AAO did not act arbitrarily and capriciously. Instead, the district court held they simply gave the *ex parte*, emergency order the same effect it would have been given in North Carolina. The district court thus denied Perez's motion to set aside final agency action and granted the Agency's motion for judgment on the record.

II.

Perez's initial argument before this Court rises and falls on single faulty premise. He mistakenly contends the Agency imposed a requirement that a custody order be permanent. He then argues that such a requirement is *ultra vires* and unlawful. His second argument is related to the first. For basically the same reasons, Perez also argues that the Agency's decision that the *ex parte*, emergency order did not comply with the SIJ statute

was arbitrary and capricious. Both mischaracterize the decisions of the Agency and the AAO and are at odds with our required standard of review.

## A.

Although this should be a straightforward case about a federal administrative agency performing its statutory duties, Perez incorrectly claims the Agency imposed an *ultra vires* "permanency" requirement on custody orders submitted with SIJ petitions. He argues that neither the text, structure nor history of the SIJ statute requires a qualifying custody order to be permanent. Perez argues the INA does not include temporal language pertaining to the required order, and claims the Agency, in requiring an order to be permanent, has gone beyond its delegated authority.

But we must keep in mind that the Court's review under the *ultra vires* standard is "necessarily narrow." *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171, 179 (4th Cir. 2012). This Court should not "dictate how government goes about its business. . . . " *Id.* Instead, this Court's role is only to determine whether an agency "has acted within the bounds of its authority or overstepped them." *Id.* (internal citations and quotation marks omitted). Government action is *ultra vires* if an agency or other government entity "is not doing the business which the sovereign has empowered [it] to do or [it] is doing it in a way which the sovereign has forbidden." *Larson v. Domestic &*

*Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). We have no such conduct by the Agency here.

First, the foundation of Perez's argument—that the Agency and the AAO imposed a permanency requirement for predicate custody orders—is simply unfounded. Nowhere in either decision is there a categorical permanency requirement. Admittedly, the Agency and AAO refer to the temporal aspects of the order. But that is simply part of the record related to this order that required the Agency's analysis. Importantly, both decisions focus more on the terms of the order that reflect its *ex parte* and emergency nature than whether it was permanent or temporary. For example, the Agency's decision points out that the order was only to remain in effect for three weeks and made insufficient factual findings to support the conclusion that it was not in Perez's best interests to return to Guatemala. The analysis portion of the AAO's decision does not even use the word permanent except to reference the *nunc pro tunc* order and Perez's assertions on his brief. Instead, the AAO decision focuses on the fact that the order was obtained *ex parte*, that it merely maintained the status quo due to the alleged emergency, that it deferred custody determinations until the July 22, 2015 hearing and that only at that July hearing could the state court make custody determinations.

Thus, when read in their totality, the decisions of the Agency and the AAO do not, as Perez insists, impose a sweeping permanency requirement binding across the board. Instead, they merely reviewed Perez's particular order and found that it did not meet the statutory SIJ requirements. In fact, as the Agency acknowledged at oral argument, it is possible an order that by its terms is temporary, but was issued after notice to all parties

40

and a hearing where all parties had the right to present their positions, would qualify under the SIJ statute. Certainly nothing in the decisions of the Agency nor the AAO would preclude such a result.

Second, determining whether an order meets the federal statutory requirements does not exceed or conflict with the Agency's authority. To the contrary, such a determination is exactly what the Agency has been tasked to do. Perez contends the INA's silence as to whether an order like the one he submitted qualifies under the SIJ statute somehow means the Agency cannot conclude that his order fails to satisfy the SIJ requirements. But administrative agencies must discharge their legislatively delegated duties, and we routinely defer to them in that work. Our holding puts a straitjacket on the Agency—and other agencies if we apply this same approach consistently—in reviewing state court orders submitted with SIJ petitions under 8 U.S.C. § 1101(a)(27)(J)(i).

Indeed, the Agency was required to analyze whether the order complied with the SIJ requirements by the INA and the accompanying regulations. Under § 1101(a)(27)(J)(iii), the Agency must consent to the petition. Clearly, in order to determine whether a petition meets the SIJ statutory requirements, the Agency has the ability to conduct a meaningful review of any custody orders submitted with the petition. Moreover, 8 U.S.C. § 1103(a)(3) empowers the Secretary of Homeland Security to "issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." 8 U.S.C. § 1103(a)(3). In response, the Agency promulgated 8 C.F.R. § 204.11, establishing the procedures for submission of SIJ applications and the Agency's review of those applications. Under the INA and regulations,

41

the Agency did not act in an *ultra vires* manner in reviewing and ultimately denying Perez's application. It simply carried out its required role of determining whether Perez's application for federal SIJ status should be granted.

On this issue, I find the Fifth Circuit's decision in *Budhathoki v. Nielsen,* 898 F.3d 504 (5th Cir. 2018) to be persuasive. In a similar appeal challenging the Agency's denial of an application for SIJ status, the Fifth Circuit noted that the question was "whether the right kind of court issued the right kind of order." *Id.* at 509. Although a state court makes the initial determinations about state law issues, the Agency considers whether those orders match the requirements for SIJ status consistent with federal requirements. *Id.* "This sort of agency obligation to review state court orders for their sufficiency is certainly the approach of the regulations identifying the documents that must be submitted in support of SIJ status. . . ." *Id.* at 511. As described above, that is precisely what the Agency did here. Adopting Perez's position places us, in my view improperly, in conflict with the only circuit that has addressed the power of the Agency to evaluate state court domestic relations orders for compliance with the SIJ statute and in the unenviable position of being the only circuit to so narrowly limit the Agency's power.

Perez's *ultra vires* argument is based on a false premise and is misguided. We should reject it because it would unnecessarily restrict the Agency from doing one of the very jobs Congress, in the INA, empowered it to do.

B.

Perez's alternative argument is related to his first. He contends that if the Agency's determination that the *ex parte*, emergency order failed to satisfy the requirements of the

42

SIJ statute was not *ultra vires*, it was arbitrary and capricious. To support his argument, Perez points out the *ex parte*, emergency order found that "(1) it has jurisdiction over Felipe Perez Perez and that he is dependent on this Court; (2) Reunification with the biological parents is not viable due to abuse, neglect, abandonment, or a similar basis found under state law; (3) it is not in Felipe Perez Perez's best interest to return to Guatemala; and (4) it is Felipe Perez Perez's best interest for temporary and permanent custody to be awarded to the Plaintiff." J.A. 129. Perez argues that language satisfies the SIJ statute, establishes that his order was "permanent enough," and demonstrates that the Agency's decision to the contrary constitutes arbitrary and capricious second guessing of the state court by the Agency.

As an initial matter, as with the *ultra vires* issue, we must employ a deferential standard of review here. The Supreme Court has indicated that the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983) (internal citation omitted). Following the Supreme Court, we have held that if the agency has followed proper procedures and has presented a rational basis for its decision, we will not disturb the agency's judgment. *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012). As long as the Agency "provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made," its decision should be sustained. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (internal citations and quotation marks

43

omitted). As described below, the Agency's decision shows the clear, rational path for its decision.

First, Perez's suggestion that the Agency's decision second guesses the North Carolina state court finds no support—not even a little—in the record. Neither the Agency nor the AAO criticized the state court. They did not state or imply that the order was wrong. They did not come to any conclusions that contradict the state court. The issue for the Agency and the AAO was not whether the North Carolina court properly applied state law. The only issue was whether the order satisfied the SIJ statute, a matter of federal law. The Agency had the power, and indeed the responsibility, to make that determination.

Next, in making its determination, the Agency appropriately explained its rationale. Its decision, and the AAO's, when read in their entirety, explain that the Agency's determination was based on the emergency, *ex parte* characteristics of the state court order. The state court order plainly indicates it was to maintain the status quo based on the alleged emergency. The order was only to last from June 29, 2015, until July 22, 2015, a mere three weeks. The order was issued without notice to Perez's parents and based on information provided only by Perez's brother without an opportunity for those allegations to be challenged, contested or opposed by Perez's parents before an outcome that altered their parental rights.

Moreover, the Agency's determination that the order did not qualify as a SIJ predicate order because of those emergency, *ex parte* characteristics was consistent with applicable North Carolina law. The North Carolina legislature provides the statutory basis for temporary emergency jurisdiction. "A court of this State has temporary emergency

44

jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." N.C. Gen. Stat. § 50A-204(a). Likewise, North Carolina case law affirms the limited reach of the temporary emergency jurisdiction. "When a court invokes emergency jurisdiction, any orders entered shall be temporary protective orders only." *In re Brode*, 566 S.E.2d 858, 860 (N.C. Ct. App. 2002). "[W]hen a trial court invokes emergency jurisdiction under the [Uniform Child Custody Jurisdiction and Enforcement Act], such jurisdiction is only temporary in nature and does not empower the trial court to enter a permanent custody order." *Id.* at 861.

Further, although a North Carolina court has jurisdiction to terminate the parental right of any parent irrespective of the state of residence of the parent, before exercising jurisdiction over the parental rights of a nonresident parent, "the court shall find that it has jurisdiction to make a child-custody determination under the provisions of G.S. 50A-201 or G.S. 50A-203, without regard to G.S. 50A-204 and that process was served on the nonresident parent pursuant to G.S. 7B-1106." N.C. Gen. Stat. § 7B-1101. This statutory provision is particularly relevant here as Perez's parents were nonresidents.

The import of these provisions and the North Carolina case law is clear. An order issued pursuant to the North Carolina court's temporary emergency jurisdiction is issued to address the alleged emergency until a hearing with notice to all parties can be held. But "[b]efore a child-custody determination is made under this Article, notice and opportunity to be heard. . . must be given to all persons entitled to notice under the law of this State as in child-custody proceedings between residents of this State, any parent whose parental

45

rights have not been previously terminated, and any person having physical custody of the child." N.C. Gen. Stat. § 50A-205. Plainly, no such notice nor hearing occurred here.

Yet Perez ignores these failings and, unfortunately, we do the same. According to our decision today, because the *ex parte*, emergency court order contained certain magic words found in the SIJ statute, the Agency's hands, in considering subsection (i) of 8 U.S.C. § 1101(a)(27)(J), were tied. This argument cannot be squared with the statutory and regulatory requirements that the Agency review the petition and the order submitted for compliance with federal law.

And our decision in *Ojo v. Lynch*, 813 F.3d 533 (4th Cir. 2016) does not justify this departure from the deferential standard of review. That case involved an across-the-board administrative interpretation of the effective date of an adoption and the Board of Immigration Appeals's associated policy of summarily disregarding *nunc pro tunc* orders relating to adoptions issued by various state courts. *Ojo*, 813 F.3d at 538. The applicable federal regulations in *Ojo* provided that adoptions that became effective after a child turned sixteen were ineffective for federal immigration purposes. In the face of that limitation, the state domestic court specifically held that the effective date of the adoption at issue occurred before the child turned sixteen. *Id.* at 536. In response, the federal agency contradicted the state court by determining the effective date of the adoption was the date the order was entered, which was after the child turned sixteen. It did so based upon a widespread BIA "rule" and interpretation of 8 U.S.C. § 1101(b)(1)(E)(i) as it related to the effective date of an adoption and the statutory phrase "adopted while under the age of sixteen years." *Id.* at 537-538. Here, as described in detail above, the Agency made no

46

decision that contradicted the North Carolina state court. And it certainly did not announce any policy, practice or categorical rule of law such as the legal definition of when an adoption is effective. Thus, *Ojo* is of no help to Perez.

Last, in reviewing the Agency's decision, it is critical to remember that our question is not whether we would have made the same decision as the Agency if we were sitting in its shoes. The question is whether the Agency's decision was arbitrary or capricious. Far from that, the Agency's decision was reasonable. It was based on the terms of the order and consistent with North Carolina appellate decisions on the legal effect of such orders. Further, both the Agency and the AAO explained their reasoning in the decisions. Under these circumstances, based on the applicable standard of review, we should affirm. In my view, our contrary conclusion fails to apply the appropriate standard of review and substitutes our judgment for that of the Agency.

## III.

Finally, in addition to suffering from the legal deficiencies described above, I fear our decision will have serious and far reaching ramifications. First, in adopting Perez's arguments, we sanction a scheme to game United States immigration laws. As noted above, Perez's brother alleged to a court of law and either Perez or his brother swore in an affidavit that temporary emergency custody of Perez was needed to protect Perez from imminent, serious physical harm from Perez's parents. But at the time the motion containing this allegation and the supporting affidavit were filed, his parents were still in Guatemala. In other words, Perez had been in the United States, over 2,700 miles from his parents, for

over a year. When asked by the panel at oral argument the basis of the purported emergency, counsel for Perez was unable to provide any explanation. He likewise provided none before the entire court sitting en banc. No one, at any time, has articulated any sort of emergency.[3]

If there was an actual emergency, one would expect Perez's brother to have filed the motion for an emergency order at the time the complaint was filed, or even sooner. But he did not do so. Instead, he waited until June 2015, just weeks before Perez turned eighteen, to file the motion.[4] By doing so, Perez was able to obtain the *ex parte,* emergency order without any meaningful examination of the allegations since the parents had no way to know the motion was even filed. And since Perez was about to turn eighteen on July 6, Perez and his brother knew the July 22, 2015 hearing the state court ordered would never happen. Perez's scheme makes a mockery of the immigration laws passed by Congress. What's more, by sanctioning this scheme, we are sending the clear message: Gaming the federal laws is fine with us. Keep doing it.

In insisting the record does not support my characterization of Perez's conduct, the majority invokes John Adams' famous reminder that "facts are stubborn things." Indeed

---

[3] The language cited by the majority at pages 6-7 of its opinion refer to circumstances that allegedly existed when Perez lived in Guatemala. Even if true, they offer no basis for an emergency, *ex parte* order hearing a year and a half after Perez left Guatemala and came to the United States.

[4] Perez flip-flopped on this issue at the *en banc* oral argument. He first suggested that he promptly filed the motion and the delay was due to the slow pace of the North Carolina court. When pressed, however, he conceded that he had not filed the motion until six months later, in June.

they are. The fact here is that the purported emergency on which Perez's motion was based involves events that occurred years ago and thousands of miles away. J.A. 116-117. The fact here is that Perez's brother waited until just before Perez turned eighteen to seek emergency relief. J.A. 88, 127. The fact here is that Perez's brother sought emergency custody of Perez without providing any notice to their parents in Guatemala. J.A. 88-89, 129-130. The fact here is that the order on which Perez's SIJ petition was based only preserved the status quo until a hearing with due process rights could be held. J.A. 130. All these facts are plainly in the record, and my good colleagues in the majority do not suggest otherwise. They simply come to a different, and in my view implausible, conclusion about them.[5]

---

[5] In considering whether Perez's conduct is part of a scheme to game our immigration laws, I note the remarkable similarities between the facts here and those of *Reyes v. Cissna*, 737 F. App'x 140 (4th Cir. 2018). There, Reyes lived with her grandparents from the time she was eleven until she was sixteen. *Id.* at 142. At age sixteen, she entered the United States unlawfully, was apprehended and, pending a removal hearing, was moved to North Carolina where her father lived. *Id.* Almost two years later, and four days before Reyes' eighteenth birthday, Reyes' father, represented by the same lawyers as Perez, filed an action in North Carolina state court to terminate the parental rights of Reyes' mother. *Id.* Reyes' father also filed a motion seeking emergency custody of Reyes because Reyes had been abandoned by her mother. Reyes' father claimed he should be awarded custody of Reyes on an emergency basis even though the alleged abandonment took place seven years earlier when Reyes was eleven and even though Reyes lived with her grandparents from that time until she came to the United States illegally. The North Carolina state court granted the emergency relief and set a hearing just five days later to determine custody. *Id.* at 143. Like our case, however, Reyes turned eighteen just before the hearing, depriving the North Carolina state court of jurisdiction to make a custody determination. Despite that, Reyes used the emergency order, obtained without any due process provided to her mother, to petition for federal SIJ benefits. *Id.* at 143. Sound familiar?

Second, our decision effectively transfers much of the responsibility of determining eligibility for SIJ benefits from the Agency—which is where Congress placed it—to state juvenile courts. In doing this, we pave the way for immigrants to seek orders from state juvenile courts in order to gain an immigration advantage. I agree that, as a general rule, neither federal agencies nor federal courts should wade into the waters of state domestic relations law. But the Agency did not make any state domestic relations law determinations. And giving appropriate respect to state courts in the area of domestic relations does not mean that the Agency must abdicate its role, rubber stamp a barebones set of "findings" or ignore the circumstances of an SIJ submission. Certainly nothing in the INA suggests that result.

Third, beyond the damage to our immigration laws, this scheme and our approval of it marginalizes the importance of parents having custody over their children. Our decision approves a scheme that terminated the custodial rights of Perez's parents without a scintilla of due process. Here, although North Carolina law requires notice and a hearing for a custody determination, Perez made an end run around that requirement with his dubious claim of emergency. And although an emergency order normally only holds the status quo in place until a hearing of which all parties receive notice and are given an opportunity to be heard, Perez's strategic timing of the emergency motion in relation to his eighteenth birthday assured that hearing would not take place. Then, the INA and its accompanying regulations, which assume that the state court order would have been carried out with due process protections, do not require the parents to be notified of the SIJ petition.

Perez's scheme, like a thief in the night, terminates his parents' custodial rights without the parents even knowing.

Last, these results would be bad enough if they affected American citizens. But here, courts in the United States are being used to eviscerate the rights of citizens of Guatemala whose parental rights should be governed by the laws of that country. Imagine the outrage we would rightly feel if another country's courts terminated the custodial rights of American citizen parents over an American child. International comity means nothing if schemes like this are endorsed.

For these reasons, I dissent.[6]

---

[6] If there is a silver lining in the results of this appeal, it is that our reversal and remand of the case does not prohibit the Agency from considering Perez's application in light of the requirements of subsection (iii) of 8 U.S.C. § 1101(a)(27)(J). In particular, the requirement that the Agency consent to the SIJ petition in subsection (iii) seems to allow the Agency, if it so choses, to withhold consent on the grounds that Perez's application is not designed as a remedy for actual abuse, neglect or other mistreatment, but to improperly gain an immigration advantage.